# EXHIBIT A

# Declaration of Mirza Baig

DocuSign Envelope ID: F04AF560-0FA3-4FFF-9750-D05D6B451E1D

**THE KOZUB LAW GROUP, PLC**
William A. Kozub, # 014826
Richard Hundley, # 019829
7537 East McDonald Drive
Scottsdale, Arizona 85250
mewak@kozublaw.com
Telephone: (480) 624-2700

Attorneys for Defendants Higher Connection, LLC; Higher Connection 3PL LLC; and Higher Connection LLC

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Ignite International, Ltd., a Wyoming corporation,<br><br>        Plaintiff,<br><br>vs.<br><br>Higher Connection LLC, a Utah limited liability company; Zachariah James Gleason; Mirza Baig; Higher Connection 3PL LLC, an Arizona limited liability company; and Higher Connection, LLC, an Arizona limited liability company;<br><br>        Defendants. | Case No. 2:2021-cv-02184<br><br>**DECLARATION OF MIRZA BAIG IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>(Assigned to United States Magistrate Judge Michael T. Morrissey) |
| Higher Connection LLC, a Utah limited liability company,<br><br>        Counterclaimant,<br><br>vs.<br><br>Ignite International, Ltd., a Wyoming corporation;<br><br>        Counterdefendant. | |

-1-

DocuSign Envelope ID: F04AF560-0FA3-4FFF-9750-D05D6B451E1D

Defendant Mirza Baig declares under penalty of perjury, as follows:

1.      I am a resident of Utah.

2.      I am a defendant in the lawsuit filed by Ignite International, Ltd. ("Plaintiff"), in the above captioned case.

3.      I am a member Higher Connection LLC, a Utah limited liability company ("Higher Connection"). Mr. Zachariah James Gleason is also a member of Higher Connection.

4.      I am the Manager of Defendants Higher Connection 3PL, LLC, an Arizona limited liability company, Higher Connection, LLC, a Utah limited liability company, and Higher Connection, LLC, an Arizona limited liability company.

5.      Defendants Higher Connection 3PL, LLC, an Arizona limited liability company, and Higher Connection, LLC, an Arizona limited liability company have never commenced business operations.

6.      On or about December 14, 2020, Plaintiff and Higher Connection entered into a written agreement whereby Higher Connection would provide warehousing, pick & pack and shipping services to Plaintiff (hereinafter the "Fulfillment Agreement").

7.      The two parties to the Fulfillment Agreement are Plaintiff and Higher Connection.

8.      I am not a party to the Fulfillment Agreement.

9.      The Fulfillment Agreement was signed by Mr. Zacharia Gleason in his capacity as the president and manager of Higher Connection. The Fulfillment Agreement was signed by Mr. John Schaefer as the president of Plaintiff.

10.      I did not sign the Fulfillment Agreement and I am not mentioned in the Fulfillment Agreement.

11.      Attached hereto as Exhibit 1 is a copy of the Fulfillment Agreement dated December 14, 2020.

12.      Upon formation of Higher Connection the members properly capitalized Higher Connection with sufficient funds to permit Higher Connection to operate, including paying start up expenses, hiring employees, purchasing office equipment and obtaining commercial space in

DocuSign Envelope ID: F04AF560-0FA3-4FFF-9750-D05D6B451E1D

which to operate the business.

13.    At all times since the formation of Higher Connection I have followed the formalities of the management structure of Higher Connection, and all business decisions of Higher Connection have been made pursuant to this management structure.

14.    At all times since the formation of Higher Connection the company has maintained bank accounts for the operation of the business of Higher Connection.

15.    Since the formation of Higher Connection the company has hired many employees and contractors. All employees and contractors have been paid by Higher Connection from Higher Connection bank accounts, with payroll tax withholdings being performed where required. All employees were properly paid by W-2 or 1099 requirements.

16.    I have never commingled personal funds with the Higher Connection bank accounts. I have never commingled funds of any nature with the Higher Connection bank accounts.

17.    I oversee the accounting of Higher Connection. The only funds received by the members or manager were paid pursuant to W-2 or 1099 requirements.

18.    I did not owe a fiduciary duty to Plaintiff.

19.    I have never been entrusted with any business secrets of the Plaintiff or powers of management over the Plaintiffs.

20.    The Fulfillment Agreement expressly disavows any "principal/agent" relationship and expressly provides that the relationship between Plaintiff and Higher Connection is purely a "contractual relationship."

21.    I have never been provided any trade secrets of Plaintiff.

22.    I have never used or misappropriated any trade secrets of Plaintiff.

23.    There is no confusion in the public between the products manufactured by Plaintiff and the warehousing and shipping services of Higher Connection.

-3-

DocuSign Envelope ID: F04AF560-0FA3-4FFF-9750-D05D6B451E1D

24.     Following the execution of the Fulfillment Agreement, Higher Connection ceased all manufacture of any products of a similar nature to those manufactured by the Plaintiff and Higher Connection resumed such business.

25.     I have never been enriched at the expense of Plaintiff and have never caused a impoverishment to the Plaintiff. All payments I have received from Higher Connection have been in my capacity as the manager and a member.

26.     There has been no impoverishment of the Plaintiff because the accounting records of Higher Connection do not match the accounting records of the Plaintiff, and the most recent accounting records of Higher Connection show the Plaintiff has been paid in full when all offsets and credits are properly applied.

27.     I have never personally sold any products of Plaintiffs, and to my knowledge all of Plaintiff's products have been handled by Higher Connection pursuant to the normal business operations arising from the Fulfillment Agreement.

28.     I have no knowledge of specific contractual relationships or business expectancies of the Plaintiff other than the Fulfillment Agreement.

29.     I have never intentionally interfered in any contractual relationships or business expectancies of the Plaintiff.

30.     I have never exercised personal dominion or control over any property of the Plaintiff. My only interaction with the Plaintiff's property is as the manager of Higher Connection and pursuant to the Fulfilment Agreement.

31.     I have never taken any steps to conspire with another person to commit any tort against the Plaintiff. All of my actions in this matter have been pursuant to my role as a manager of Higher Connection, that was operating pursuant to the Fulfillment Agreement.

I declare the foregoing under penalty of perjury under the laws of the State of Arizona.

DATED this _____ day of May, 2023.

_____
Mirza Baig

-4-

# EXHIBIT 1

1

## FULFILLMENT AGREEMENT

This Agreement is made and entered into as of [REDACTED] (the "**Effective Date**").
December 14, 2020

BETWEEN:

      **IGNITE INTERNATIONAL, LTD.**, a corporation incorporated under the laws of the State of Wyoming with its registered at 360 N. Sepulveda Blvd., Suite 2000, El Segundo, CA 90245

      ("**Ignite**")

AND

      **HIGHER CONNECTION, LLC**, a limited liability company formed under the laws of the State of Utah with its registered office at 1505 N. 29th Avenue, Phoenix, AZ 85009

      ("**HC**")

**WHEREAS:**

A.     HC is in the business of providing warehousing, pick & pack and shipping services for customers;

B.     Ignite wishes to engage HC to provide the Services (as defined herein) for Ignite's online orders for Products (as defined herein), on and subject to the terms and conditions in this Agreement (the "**Purpose**").

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party hereto, the Parties agree as follows:

1.     **DEFINITIONS**

In this Agreement:

(a)    "**Agreement**" means this agreement, including and Schedules.

(b)    "**business day**" means any day other than a Saturday, Sunday or a statutory holiday in the United States.

(c)    "**Change of Control**" means in respect of HC: i) the closing of a merger, consolidation, liquidation or reorganization of HC into or with another company or other legal person, after which merger, consolidation, liquidation or reorganization the capital stock of HC outstanding prior to consummation of the transaction is not converted into or exchanged for or does not represent more than 50% of the aggregate voting power of the surviving or resulting entity; (ii) the direct or indirect acquisition by any person of more than 50% of the voting capital stock of HC, in a single or series of related transactions; (iii) the sale, exchange, or transfer of all or substantially all of HC's assets (other than a sale, exchange, or transfer to one or more entities where the stockholders of HC immediately before such sale, exchange or transfer retain, directly or indirectly, at least a majority of the beneficial interest in the voting stock of the entities to which the assets were transferred).(

2

(d)     "**Confidential Information**" means all information in any form (including electronic, physical, intangible, visual and oral, and whether or not marked, disclosed or indicated as confidential or proprietary) known, held, used or disclosed by or on behalf of a party and each of its affiliates and subsidiaries in connection with its or their business that is not at the time of disclosure available or known to the general public, or that, by its nature or the nature of its disclosure, ought reasonably be known as confidential, proprietary or a trade secret of Discloser or such affiliates or subsidiaries, including: technical information (including source code); Intellectual Property; supplier and customer information (whether past, present, future and prospective); strategic plans; data; technical information or engineering data (including drawings, writings, reports, analyses and notes) financial information; marketing information; business opportunity information, strategies, R&D; forecasts; and plans. Without limiting that, the Purpose and this Agreement are part of the Confidential Information.

(e)     "**Consents**" means all permissions, consents, approvals, certificates, permits, licenses, agreements and authorities (whether statutory, regulatory, contractual or otherwise) necessary for the provision of the Services on the terms of this Agreement.

(f)     "**Fulfillment Products**" means synthetic nicotine vape devices and related accessories.

(g)     "**Good Industry Practice**" means the exercise of that degree of skill, care, prudence, efficiency, foresight and timeliness as would be expected from a leading company within the relevant industry or business sector.

(h)     "**Ignite IPRs**" means Trade Marks and all Intellectual Property Rights of which Ignite is the owner or licensee and which are disclosed, licensed or provided to HC pursuant to this Agreement.

(i)     "**Ignite Materials**" means any equipment, tools, documents, information, items and materials, other than Fulfillment Products, whether owned by Ignite or a third party, provided by Ignite to HC which are used directly or indirectly in the supply of the Services.

(j)     "**Intellectual Property Rights or IPRs**" means patents, industrial designs, utility models, rights to inventions, copyright and neighboring and related rights, trademarks, trade names business names and domain names, rights in get-up and trade dress, goodwill and the right to sue for passing off, rights in designs, rights in computer software, rights in data, database rights, rights to use, and protect the confidentiality of, confidential information (including know-how and trade secrets), and all other intellectual property rights, in each case whether registered or unregistered and including all applications and rights to apply for and be granted, renewals or extensions of, and rights to claim priority from, any rights and all similar or equivalent rights or forms of protection that subsist or will subsist now or in the future in any part of the world.

(k)     "**Mandatory Policies**" means Ignite's business policies and codes notified by Ignite in writing to HC from time to time.

(l)     "**Party**" means a party to this Agreement and any reference to a Party includes its successors and permitted assigns and "**Parties**" means every Party.

(m)     "**Representative**" means an employee or authorized agent of HC or Ignite.

(n)     "**Service Level Specifications**" shall mean the Warehousing and Fulfillment Service Level Specifications attached hereto as Schedule A.

(o)     "**Services**" means HC's provision of certain warehousing, packaging, returns processing and

3

fulfillment services as described in the Service Level Specifications.

(p) **"Territory"** means the United States.

(q) **"Trade Marks"** means the trademark registrations and applications listed in Schedule C and any further trademarks that Ignite may, by express notice in writing, permit or procure permission for HC to use in the Territory in respect of the Fulfillment Products.

(r) **"Warehouses"** shall mean HC's warehouse buildings located at: 1505 N. 29th Avenue, Phoenix, Arizona 85009 and related facilities, including ingress thereto and egress therefrom, or any other warehouse facility of HC that is approved by Ignite, which approval shall not be unreasonably withheld or delayed.

**2.   FEES AND OTHER CHARGES**

(a) Fees: The fees for the Services are set forth in Schedule B attached hereto (the **"Fees"**).

(b) Freight: All freight and postage expenses incurred on behalf of Ignite by HC in providing the Services shall be invoiced to Ignite at actual cost, not published rates, with no mark-up or additional fees; any such expenses incurred on behalf of Ignite by HC in providing the Services in connection with mixed shipments shall be allocated pro rata to the weight of the Fulfillment Products shipped. Such expenses shall be subject to the provisions of 2(d) of this Agreement. For purposes of this 2(b), "published rates" shall mean the then-prevailing, generally available common carrier charges that are issued by HC transportation suppliers. HC agrees to use commercially reasonable efforts to maximize efficiencies and reduce expenses for freight and postage incurred on behalf of Ignite in providing the Services.

(c) Taxes and Other Expenses: Ignite agrees that the Fees are exclusive of (i) freight, transportation and postal service charges and (ii) any manufacturer's, retailer's occupation, use, sales, excise, value added or other tax, or any similar charge imposed by any governmental authority with respect to the performance of the Services. Any such cost of freight, tax or charge, and all postal service charges, shall be paid by Ignite (in addition to the amount of any fees payable under this Agreement) against the provision by HC of a proper invoice and supporting documentation therefor.

(d) Discounts: Any signing bonus and volume or trade discounts and rebates earned or to be earned with respect to materials or services utilized by HC or for which HC contracts for or purchases on behalf of Ignite, in whole or in part, including freight, in connection with HC's performance under this Agreement shall be passed through to Ignite as either "on-invoice" credits or as credits issued by HC to Ignite within sixty (60) days after receipt of such bonus, discount, or rebate by HC.

(e) Adjustments: The Fees set forth in section 2(a) remain in effect for the Term subject to any further adjustments agreed in writing by both parties from time to time.

(f) Currency: Unless otherwise stated, all references to currency or $ in this Agreement are to the United States Dollar.

**3.   SERVICES**

(a) Warehousing and Fulfillment Services: The Services covered by this Agreement are set forth in Schedule A along with the Service Level Specifications and are subject to revision from time to time by mutual written agreement of the parties.

Case 2:21-cv-02184-MTL   Document 56-1   Filed 05/18/23   Page 10 of 56
Case 2:21-cv-02184-MTL   Document 1-2   Filed 12/21/21   Page 9 of 23

4

(b)      <u>Provision of Services</u>: HC shall:

       (i)      provide the Services on a non-exclusive basis in accordance with the specifications and within the time(s) set forth in the Service Level Specifications and/or as established by mutual agreement of the parties;

       (ii)      provide the Services with reasonable skill and care and in accordance with Good Industry Practice;

       (iii)      obtain, maintain and comply with all Consents;

       (iv)      allocate sufficient resources to enable it to provide the Services in accordance with the terms of this Agreement;

       (v)      ensure that all staff engaged in the provision of the Services will be competent and appropriately trained and under appropriate supervision;

       (vi)      hold all Ignite Materials in safe custody at its own risk and maintain Ignite Materials in good condition until returned to Ignite, and not dispose of or use Ignite Materials other than in accordance with Ignite's written instructions or authorization;

       (vii)      inform Ignite of all health and safety and security requirements that apply at the Warehouses; and

       (viii)      notify Ignite in writing immediately upon the occurrence of a Change of Control of HC or any material change of HC's key management personnel.

(c)      <u>Access to Logistics Software</u>: Upon request of Ignite, HC shall grant Ignite access to view online inquiry screens of the warehouse and transportation management software or system(s) then currently being used for the operation of the Warehouses, for up to an agreed upon number of users.

## 4.      OTHER PROVISIONS

(a)      <u>Inspection of Records</u>: Ignite may inspect HC's records as they relate to the Services quarterly, at office working time and upon fifteen (15) days' prior notice to verify HC's compliance with its obligations under this Agreement. Ignite shall ensure that when carrying out any inspection it shall do so in such a way to avoid causing unnecessary disruption to the routine of HC. In fulfilling its obligations, HC may be required, from time to time upon request of Ignite, to produce a statement of account from supplier(s) which provide services to HC in the fulfillment of Services pertaining to this Agreement.

(b)      <u>Comparable Pricing</u>: HC represents that the Fees for the Services shall not be more than HC's lowest price to any other HC customers for comparable services, specifications and quantities.

(c)      HC shall:

       (i)      store the Fulfillment Products in its possession separately from all other goods held by HC so that they remain readily identifiable as Ignite's property;

       (ii)      not remove, deface or obscure any identifying mark or packaging on or relating to the Fulfillment Products; and

       (iii)      keep and maintain the Fulfillment Products in good condition and/or in accordance with

5

Ignite's written instructions from time to time, shall not dispose of or use the Fulfillment Products other than in accordance with the Ignite's written instructions or authorization.

(d)     Subject to section 4(c):

    (i)     HC may use such method for the storage and handling of the Fulfillment Products as it in its absolute discretion considers appropriate; and

    (ii)    HC shall have a discretion as to where in the Warehouses it shall store the Fulfillment Products and it may, without notice to Ignite but at HC's expense, move the Fulfillment Products from one part of one of the Warehouses to another part of one of the Warehouses.

## 5.   PAYMENT TERMS

(a)     Services: HC shall invoice Ignite on a monthly basis for the Services pursuant to the methodology in Schedule B. Unless otherwise provided, invoices are payable by Ignite within thirty (30) days after receipt of the invoice.

(b)     Documentation: HC shall provide all and any appropriate back-up documentation to Ignite's finance department for all charges reflected on its monthly invoices.

(c)     Interest: If a party fails to make any payment due to the other under this Agreement by the due date for payment, then, without limiting the other party's remedies under this Agreement, the defaulting party shall pay interest on the overdue amount at the rate of 4% a year (to the maximum extent permitted by applicable law, whichever is less) until such balance has been paid in full. This interest shall accrue on a daily basis from the due date until actual payment of the overdue amount, whether before or after judgment. The defaulting party shall pay the interest together with the overdue amount. In relation to payments disputed in good faith, interest under this section 5(c) is payable only after the dispute is resolved, on sums found or agreed to be due, from the due date until payment.

## 6.   CONTACTS

HC and Ignite shall each designate a contact person to address any day-to-day issues that may arise under this Agreement with respect to the Services, including: establishing priorities; establishing, documenting and maintaining procedures; administering the financial arrangements under this Agreement; and other day-to-day matters. The respective contacts shall meet at least biweekly to review processes, procedures and Service Level Specifications so that they may be improved. To the extent the contact person is not authorized to decide any particular matter, the contact person will contact his or her organization to obtain a decision or call a meeting at which the decision will be made. The parties agree that as part of the biweekly meetings pursuant to this Section 6, they will discuss strategic decisions that may, directly or indirectly, affect the provision of the Services hereunder. Nothing in this Section 6, including any discussions, meetings or determinations of the parties at such meetings, shall operate to relieve either party from its obligations under this Agreement unless the parties mutually agree to do so in writing signed by both parties.

## 7.   HC'S FACILITY

(a)     HC shall maintain the Warehouses at its own expense and warrants on an ongoing basis that it has the right to use the Warehouses for the purpose of providing the Services. Except as specifically provided herein, the Services shall be provided exclusively at the Warehouses.

(b)     HC has provided to Ignite a disaster recovery plan that outlines procedures in the event of any disaster that could affect the performance of Services hereunder, including a failure in the computer

Case 2:21-cv-02184-MTL    Document 56-1    Filed 05/18/23    Page 12 of 56
Case 2:21-cv-02184-MTL   Document 1-2   Filed 12/21/21   Page 9 of 23

6

system or software for the Warehouses. HC shall maintain such disaster recovery plan in place, as it may be modified by HC from time to time in its reasonable discretion.

**8.    INTELLECTUAL PROPERTY RIGHTS**

(a)    HC acknowledges that Ignite's IPRs and the Trade Marks are and remain the exclusive property of Ignite or, where applicable, the third party licensor from whom Ignite derives the right to use them.

(b)    Ignite shall retain ownership of, and HC shall in no circumstances acquire any right, title or interest in or to, any Intellectual Property Rights in any Ignite Materials or Ignite IPRs.

(c)    HC shall have no right to use any of Ignite's IPRs and the Trade Marks on or in relation to any of its products or services unless express written consent is granted by Ignite. To the extent such rights are licensed by Ignite to HC, both parties agree that Ignite shall at all times retain direct or indirect control of the character and quality of the relevant goods and services of the relevant Trade Marks.

**9.    EMPLOYEES AND INDEPENDENT CONTRACTORS**

(a)    HC is an independent contractor and is not an agent or employee of Ignite. Nothing in this Agreement shall be construed to create an employer/employee, principal/agent, joint venture, partnership, or other relationship between HC and Ignite, other than the contractual relationship set forth herein. None of HC's employees shall be considered to be employees or agents of Ignite. HC shall be solely responsible for hiring, compensating, providing benefits to, and terminating all employees and independent contractors in connection with the operation of the Warehouse, in accordance with all applicable laws, statutes, rules, and regulations.

(b)    HC (and not Ignite) shall be responsible for the payment of all salary, benefits, income tax, employment insurance premiums, pension contributions, social security contributions and other deductions and withholdings, and for the operation of related payroll administration, with respect to HC's employees.

**10.    INSPECTION OF WAREHOUSE**

Ignite may have reasonable access during normal business hours to the Warehouses from time to time to observe HC's performance of the Services if and to the extent Ignite reasonably believes the Services are not being provided in accordance with the Service Level Specifications or to the extent necessary to permit Ignite to determine any matter relating to its rights and obligations hereunder, upon no less than seventy-two (72) hours' advance notice (or, in the case of urgent stock quality issues, upon no less than twenty-four (24) hours' advance notice); provided that any such access by Ignite shall not unreasonably interfere with the conduct of the business of HC. Ignite bears the risk of injury to any of its employees or representatives who are provided access to the Warehouses hereunder, and shall indemnify, defend and hold HC harmless for all damages resulting from Ignite's or its employees' or representatives' access to the Warehouses provided hereunder.

**11.    INSURANCE**

HC shall at all times during the Term maintain (i) property insurance from a carrier having an "A.M. Best" rating of not less than "A" sufficient to cover the replacement cost of capital equipment and personal property located at the Warehouses of $2,000,000; (ii) commercial general liability insurance from a carrier having an "A.M. Best" rating of not less than "A" with coverage of single

Case 2:21-cv-02184-MTL   Document 1-2   Filed 12/21/21   Page 8 of 23

7

limit of not less than Five Million Dollars ($5,000,000), and (iii) worker's compensation insurance as required by law. HC shall ensure that Ignite and its affiliates are additional named insureds on each insurance policy. HC shall provide Ignite with a certificate of insurance evidencing that the insurance coverages required under this Section 11 are in full force and effect, as soon as available prior to commercial activation. HC shall provide updated certificates of insurance in the event of any renewal or replacement of such insurance coverages.

12.  **WARRANTIES, AGREEMENTS AND INDEMNITIES**

(a)  <u>Service Levels; Service Level Specifications</u>: HC agrees that all Services shall be performed in accordance and in compliance with the description of services set forth in this Agreement, including the Service Level Specifications set forth in Schedule A. For clarity, the failure to meet Service Level Specifications shall be considered a breach of this Agreement.

(b)  <u>Compliance with Laws</u>: Except with respect to materials supplied by Ignite, HC represents and warrants to Ignite that it is and will remain, in connection with the provision of the Services under this Agreement, in compliance with:

   (i)  all applicable statutes, laws, rules and regulations, including applicable federal, provincial, state and local statutes, rules, regulations and orders relating to (1) the protection of the environment ("**Environmental Laws**"), (2) real estate, zoning, and construction, and (3) employment and employment practices, terms and conditions of employment, discrimination, harassment, child labor, safety, wages, hours and overtime rates, the withholding and payment of taxes from the compensation of employees, occupational health and safety laws and all other taxes and regulations pertaining to employment and employee benefits (collectively, "**Employment Laws**"); and

   (ii)  the Mandatory Policies.

(c)  <u>Indemnities:</u>

   (i)  HC agrees to defend, hold harmless and indemnify, on an after tax basis, Ignite and all shareholders, directors, officers, employees, representatives and agents thereof, from and against any and all claims, actions and allegations ("**Claims**") that may be made against such indemnified parties by third parties (including government agencies), and against liabilities, expenses (including reasonable attorneys' fees and costs) and damages (including for personal injury or death, or damage to property) for which Ignite becomes liable as the result of such Claims to the extent that such Claims arise directly from or in connection with HC's breach of any of its representations, warranties or agreements in this Agreement; provided, however, that if Ignite seeks indemnity hereunder it shall provide to HC prompt written notice of any such Claim, not make any admission in respect of such Claim and shall permit HC to defend the same in its own name or in the name of the party seeking indemnity hereunder; and provided further that Ignite may not settle any Claim without the prior written consent of HC.

   (ii)  Ignite agrees to defend, hold harmless and indemnify, HC and all shareholders, directors, officers, employees, representatives and agents thereof, from and against any and all Claims that may be made against such indemnified parties by third parties (including government agencies), and against liabilities, expenses (including reasonable attorneys' fees and costs) and damages (including, without limitation, for personal injury or death, or damage to property) for which HC becomes liable as the result of such Claims, to the extent that such

Case 2:21-cv-02184-MTL   Document 56-1   Filed 05/18/23   Page 143 of 56
Case 2:21-cv-02184-MTL   Document 1-2   Filed 12/21/23   Page 14 of 56

8

Claims arise directly from or in connection with (A) Ignite's breach of any of its representations, warranties or agreements in this Agreement, or (B) content provided by Ignite to HC or any aspect of the Fulfillment Products (except to the extent Claims are related to how the Fulfillment Products were stored or processed through the Warehouse), including any claims of infringement, misappropriation or other violation of any intellectual property rights or personal rights related to such content or Fulfillment Products; provided, however, that if HC seeks indemnity hereunder it shall provide to Ignite prompt written notice of any such Claim, not make any admission in respect of such Claim and shall permit Ignite to defend the same in its own name or in the name of the party seeking indemnity hereunder; and provided further that HC may not settle any Claim without the prior written consent of Ignite.

(d)   _Survival of Representations, Warranties and Agreements._ The representations, warranties and agreements contained in this Agreement shall survive until the date of termination of this Agreement in accordance with its terms, other than those which by their nature are intended by the parties to survive termination.

(e)   _Limitation of liability._ Ignite's total cumulative liability arising in any manner under or in connection with this Agreement will not exceed the lesser of (i) the aggregate of the amounts paid by Ignite to HC under this Agreement in a 12-month period commencing with the date of this Agreement or any anniversary of it, and (ii) the maximum insurance coverage which may be claimed by Ignite as a result of such liability. Notwithstanding the foregoing, a party's liability under this Agreement for death or personal injury resulting from its gross negligence or any matter for which it would be illegal to exclude or attempt to exclude liability or any breach resulting from willful misconduct, shall not be limited.

(f)   _Lien on Inventory._

   (i)   Ignite hereby agrees and acknowledges that, pursuant to Arizona law, HC has a warehouseman's lien against Ignite's goods now or hereafter in the possession of HC, and on the proceeds thereof, for charges and expenses in relation to such goods and for expenses necessary for preservation of such goods or reasonably incurred in their sale pursuant to law. Ignite hereby acknowledges that this Agreement and each invoice of HC issued hereunder constitute "warehouse receipts" under Arizona law.

   (ii)   In addition to and not in limitation of the foregoing Section 12(f)(i), Ignite hereby grants to HC a security interest and lien in all goods and inventory of Ignite, and the proceeds thereof, at any time in the possession of HC to secure any and all obligations or amounts owing at any time by Ignite to HC under this Agreement or under any other contract, or owing under statute or by operation of law.

   (iii)   If Ignite fails to pay all outstanding amounts due under this Agreement within thirty (30) days after termination of this Agreement and demand for final payment by HC, then HC, at its option, may (but shall not have any obligation to) (i) sell all or any of the Fulfillment Product in its inventory at public or private sale and (ii) exercise any and all other rights of a warehouse or secured party under and in accordance with the Arizona Uniform Commercial Code. Costs incurred by HC in the sale of Fulfillment Products under this Section are the responsibility of Ignite and shall be deducted from the proceeds of such sale. Sale of Fulfillment Product under this Section does not relieve Ignite of its obligation to pay the full amount of the outstanding balance of any amounts due HC under this Agreement or any other contract.

9

### 13.    TITLE TO FULFILLMENT PRODUCTS AND RISK OF LOSS

(a)    Title to the Fulfillment Products shall be held by Ignite at all times and HC shall acquire no rights in, to or over the Fulfillment Products at any time.

(b)    HC shall be responsible for unloading the Fulfillment Products at the Warehouses and the Fulfillment Products shall be at HC's risk during unloading.

(c)    The Fulfillment Products shall remain at HC's risk until their delivery into the possession of any of:

    (i)    Ignite or Ignite's carrier, agent or logistics provider; or

    (ii)    Ignite's customer or its customer's carrier, agent or logistics provider,

in each case as evidenced by written receipt.

(d)    HC shall be liable for (collectively, "**Loss**"):

    (i)    unaccountable losses of Fulfillment Products while in its custody or under its control beyond one-half of one percent (0.5%) of the value of the Fulfillment Products, calculated on an annual basis, based upon Ignite's actual cost of such Fulfillment Products (the "Shrinkage Allowance"); and

    (ii)    losses caused by out of rotation stock management and inefficient picking of the Fulfillment Products beyond the Shrinkage Allowance; and

    (iii)    ascertainable losses, destruction of or damage to the Fulfillment Products beyond the Shrinkage Allowance due to HC's negligence or willful acts, omissions and default, including but not limited to theft, misappropriation or damage caused by HC, its employees, agents or representatives while the Fulfillment Products are in the custody or under the control of HC.

(e)    HC shall compensate Ignite for any Loss at the full price of such Fulfillment Products and for any costs and expenses (including any sums payable by Ignite to its end-customers for non-delivery of the Fulfillment Products as a result of any Loss) incurred by Ignite as a result of the Loss.

### 14.    CLAIMS

All claims for damaged Fulfillment Products or for shortages must be made by Ignite in writing within thirty (30) calendar days after the relevant delivery, in each case fully setting forth the nature of the alleged damage or shortage and providing supporting evidence, including in the case of damaged Fulfillment Products samples demonstrating any such damage or reports from Ignite's customers.

### 15.    TERM AND TERMINATION

(a)    Term. This Agreement shall commence on the Effective Date and shall continue for a period of one (1) year (the "**Term**"), unless terminated earlier pursuant to the terms of this Agreement.  The Term may be extended for additional one (1)-year periods upon the mutual agreement of the parties.

(b)    Termination for Convenience. Either Party shall have the right to terminate this Agreement for any reason upon delivery of sixty (60) days' written notice to the other Party.

10

(c)     Termination With Cause. In the event of a material breach of this Agreement by either Party, the non-breaching Party, in addition to any other remedy that it may have, shall have the right to terminate this Agreement by written notice to the breaching Party setting forth the details and date of the purported breach. If the breach is not cured within thirty (30) days after such notice, the non-breaching Party alleging the breach shall have the right to terminate this Agreement by further notice to the breaching Party and this Agreement shall terminate as of the date of such further notice. Subject to the terms hereof all rights, remedies and recourses provided for herein shall be in addition and without prejudice to the rights and remedies available to the Parties.

(d)     Termination on Insolvency. Either Party may terminate this Agreement should the other Party make an assignment for the benefit of its creditors, file a petition in bankruptcy, be adjudicated insolvent or bankrupt, file a petition or apply to any tribunal for any receiver, trustee, liquidator or sequestrator of any substantial portion of its property, or should the other Party commence any proceeding under any law or statute of any jurisdiction respecting insolvency, bankruptcy, reorganization, arrangement, re-adjustment of debt, dissolution, winding-up, composition or liquidation, or otherwise take advantage of any bankruptcy or insolvency legislation.

(e)     Termination on Change of Control. Ignite may terminate this Agreement by written notice without payment of any amount or penalty if there is a Change of Control of HC to which Ignite reasonably objects, provided that Ignite serves its notice within three months of the date on which HC informs Ignite (by written notice) of the Change of Control or on which Ignite otherwise becomes aware of the Change of Control.

(f)     Effect of Termination. The parties agree that, should termination of this Agreement occur for any reason, HC shall

  (i)     cease all manufacturing and distribution of the Products as soon as practical and, so long as this Agreement is not terminated by Ignite due to a material breach by HC, HC shall have the right, for a six-month period, to market and dispose of all remaining inventory of the Products in the ordinary course of business, in accordance with the terms and conditions of this Agreement; and

  (ii)     Except with respect to Sections 2, 12, and 16-19 and other obligations that expressly survive the expiration or termination of this Agreement, all other rights and licenses granted under this Agreement shall terminate on the termination date.

(a)     If HC fails to perform any of its material obligations under this Agreement, and fails to cure the same within thirty (30) days after receipt of written notice from Ignite specifying such default, Ignite shall have the right to terminate its obligations under this Agreement (except such obligations as relate to the performance of Services prior to termination). This right of Ignite shall be in addition to and not in substitution for any other rights of Ignite.

(b)     If Ignite fails to perform any of its material obligations under this Agreement (including paying any invoice when due, except in the case of a good faith dispute with respect to such invoice, in which case Ignite shall be obligated to pay the amount of such invoice that is not in dispute) and fails to cure the same within thirty 30 days after receipt of written notice from HC specifying such default, then HC shall have the right to terminate its obligations under this Agreement (except such obligations as relate to the performance of Services prior to termination). This right of HC shall be in addition to and not in substitution for any other rights of HC.

Case 2:21-cv-02184-MTL    Document 56-1    Filed 05/18/23    Page 17 of 56
Case 2:21-cv-02184-MTL    Document 1-2    Filed 12/21/21    Page 12 of 23

11

**16.    CONFIDENTIALITY**

(a)    Disclosure and Term. Both Ignite and HC acknowledge that each party (in such context a "**Discloser**") may disclose to the other ("**Recipient**") Confidential Information. This Section 16 covers disclosure of Confidential Information during the five (5) year period following the date set out below, but Recipient's obligations in respect of the Confidential Information will survive in perpetuity, subject to (c).

(b)    Obligations. Recipient will, at all times, protect, keep confidential and safeguard all of Discloser's Confidential Information using the same degree of care as Recipient uses to protect Recipient's own similar information, but at least a reasonable degree of care, including: (a) promptly notifying Discloser of any breach of this Section and reasonably assisting Discloser in connection therewith; (b) not, directly or indirectly, using or copying any of Discloser's Confidential Information except as strictly necessary to carry out the terms of this Agreement; and (c) disclosing Discloser's Confidential Information strictly to representatives (and, if applicable, employees and other personnel) of Recipient or Recipient's organization for whom disclosure is necessary to carry out the Purpose on a strictly "need to know" basis (each "**Further Recipients**"), provided that such Further Recipient has a legally-enforceable obligation of confidentiality at least as restrictive as that set out in this Agreement. Recipient will ensure that its Further Recipient's fully comply with this Agreement and will be responsible for all acts and omissions thereof as if Recipient's own.

(c)    Required Disclosure and other Exceptions. If Recipient is requested or required under any law (including questions, interrogatories, requests, subpoenas, civil demands or similar processes, and including regulatory bodies) to disclose any Discloser Confidential Information, Recipient may disclose strictly that which is required, provided that Recipient gives Discloser prompt written notice of such requirement so that Discloser may contest or restrict the disclosure, and reasonably cooperates in good faith with Discloser in Discloser's efforts to so restrict or contest such disclosure. Furthermore, Recipient has no obligations to information where it can establish, with documentary evidence and other than in connection with a breach of this Agreement, such information (a) was already, or becomes, known to Recipient without a duty of confidentiality and without direct or indirect use whatsoever of Discloser's Confidential Information, or (b) is, or becomes, generally available to the public rightfully without restrictions of confidentiality.

(d)    Return. Upon request of Discloser, Recipient will immediately return to Discloser all of Discloser's Confidential Information in any form (including copies and extracts) in its possession or control that are capable of return, and will destroy all others, and will thereafter promptly provide a certificate (of an authorized officer, if appropriate) confirming compliance herewith. Recipient may destroy electronic Confidential Information using commercially reasonable means (but any such Confidential Information restored or recovered by any means will be treated confidentially pursuant to this Agreement).

(e)    Ownership. Recipient acknowledges and agrees that all Discloser Confidential Information is the sole and exclusive property of Discloser regardless of when it came into being, and that all right, title and interest therein and thereto will be and remain vested in Discloser or its licensors except for the limited right for to use it in accordance with this Agreement for the Purpose.

(f)    Disclaimer. All Confidential Information is provided "as-is" and "as-available", and Discloser expressly disclaims any warranties, express, implied or otherwise, regarding its Confidential Information. Discloser shall have no liability of any nature or kind whatsoever (including consequential loss or damage) to Recipient resulting from disclosure of Confidential Information hereunder.

12

(g)    Notices. Every notice to be given pursuant to this Section 16 will be in writing and delivered personally or sent by registered or certified mail to the address set out above (or by such means as the receiving party may give notice).

(h)    Relief. Recipient acknowledges that a breach of this Section 16 would cause Discloser immediate, irreparable harm for which money would be inadequate recompense. Upon any actual or threatened breach hereof, Discloser may, without limiting other remedies, seek to enforce this Section by injunction, specific performance or other equitable relief, without proof of actual damage or posting of any security bond.

## 17.    TRANSITION PROVISIONS ON TERMINATION

The following provisions are intended to survive the date on which this Agreement is terminated ("**End Date**"):

(a)    Returns: HC shall continue to process all returns received for the ninety (90) day period following the End Date.

(b)    Inventory Removal: Following the End Date, at Ignite's expense Ignite shall remove the Fulfillment Products from the Warehouses (but in any event no later than thirty (30) days prior to the End Date), and HC shall, at Ignite's request, provide reasonable assistance (at Ignite's expense) to Ignite in connection therewith. Notwithstanding the foregoing, HC agrees that Ignite may begin to so remove Fulfillment Products from the Warehouses starting ninety (90) days before the End Date. During this time, Ignite will be billed at the normal rates; provided that any charges incurred by HC in connection with the removal shall be charged to Ignite at actual cost (and not the Fees set forth in Schedule B). Ignite shall ensure that the remaining Fulfillment Products at the Warehouses are at all times sufficient for the provision of Services in accordance with this Agreement to be continued until the End Date.

(c)    Referrals: Until ninety (90) days after the End Date, HC shall duly and promptly refer to Ignite all customer calls, faxes, emails, orders, complaints, and written correspondence (to the extent HC actually receives any such customer calls, faxes, emails, orders, complaints, or written correspondence).

(d)    Effect on Rights: Neither the expiration nor termination of this Agreement for any reason shall affect any rights or obligations of any party which have accrued as of the effective date of such expiration or termination. Upon any termination or expiration of this Agreement, neither party shall have any liability nor obligation to the other hereunder except as expressly provided in this Agreement.

## 18.    NOTICES

(a)    Method of Delivery. All notices to be sent to a Party shall either be sent or dispatched via e-mail with confirmed answer-back by e-mail or proof of delivery or mailed by First Class prepaid Air Mail or registered mail return receipt requested, to the Parties as shown below.

        If to HC:

        Higher Connection
        1505 N. 29th Avenue
        Phoenix, AZ 85009

Case 2:21-cv-02184-MTL   Document 56-1   Filed 05/18/23   Page 19 of 56
Case 2:21-cv-02184-MTL   Document 1-2   Filed 12/21/21   Page 14 of 25

13

Attn:  Zach Gleason
Email:  zach.gleason@higherconnection.co

With a copy to:
William A. Kozub, Esq.
The Kozub Law Group, PLC
7537 E. McDonald Drive
Scottsdale, Arizona 85254
Email:  wkozub@kozublaw.com

If to Ignite:
Ignite International, Ltd.
360 N. Sepulveda Blvd.
Suite 2000
El Segundo, CA 90245
Attn:   John Schaefer, President
Email:  johnschaefer@ignite.co

With a copy to:

paul.dawdall@ignite.co
linda.menzel@ignite.co

(b)    Deemed Receipt. A notice delivered in accordance with the foregoing shall be deemed to have been received on the date of delivery or, if sent by e-mail, on the day of transmission or, if such day is not a business day, on the first business day following the day of transmission; provided that if such notice is delivered or sent by email after 4:30 p.m. (local time), such notice will be deemed to be received on the next business day. The Parties may from time to time notify the other in the manner provided in section 19(a) of a change of address which from the effective date of such notice and until changed by like notice, shall be the address of such Company, for all purposes of this Agreement.

19.    **MISCELLANEOUS**

(a)    Amendments and Updates. This Agreement may not be modified or amended unless in writing by mutual agreement of the Parties. Provided however, the Parties acknowledge and agree that the Fulfillment Products and Specifications may be subject to further change in accordance with the provisions of this Agreement or as otherwise agreed by the Parties. Any and all such amendments and updates shall be in written form, shall be agreed to by the Parties in writing and shall be deemed incorporated in this Agreement.

(b)    Successors and Assigns. This Agreement and each and every covenant, term and condition herein shall be binding upon and inure to the benefit of both the Parties hereto and their respective successors. HC may not assign, sell, or otherwise transfer any or all rights and obligations under this Agreement without the prior written consent of Ignite. Ignite shall be entitled to assign, sell, or otherwise transfer all of its rights and obligations under this Agreement.

(c)    Entire Agreement. This Agreement, including the Schedules hereto and any Supplemental Notices which are incorporated into and form an integral part of this Agreement, is a complete and exclusive

statement of the Agreement between the Parties and supersedes all prior and contemporaneous agreements, negotiations, discussions, and proposals, oral or written, and any and all other communication relating to the subject matter of this Agreement.

Case 2:21-cv-02184-MTL   Document 56-1   Filed 05/18/23   Page 20 of 56
Case 2:21-cv-02184-MTL   Document 1-2   Filed 12/21/21   Page 15 of 25

14

(d) <u>Severability</u>. Should any part or provision of this Agreement be held unenforceable or in conflict with the applicable laws or regulations of any jurisdiction, the invalid or unenforceable part or provision shall be replaced with a provision which accomplishes, to the extent possible, the original business purpose of such part or provision in a valid and enforceable manner, and the remainder of this Agreement shall remain binding upon the Parties hereto. In the event that such a provision cannot be included in the Agreement and the absence thereof materially changes a Party's obligations or rights under this Agreement, such Party shall have the right to terminate this Agreement.

(e) <u>Partnership or Agency.</u> Nothing in this Agreement shall be deemed to constitute or imply a partnership between the Parties. HC shall not have the authority to bind Ignite or to contract in the name of Ignite or create any liability for Ignite at any time. Ignite shall not have the authority to bind HC or to contract in the name of HC or create any liability for HC at any time.

(f) <u>Waiver</u>: The failure of either Party to enforce any term or condition of this Agreement shall not be construed to be a waiver of such term or the Party's responsibility for such term or condition, and shall in no way affect the right of a Party to enforce thereafter said term or condition.

(g) <u>Force Majeure</u>. Neither Party shall bear responsibility for the complete or partial non-performance of any of its obligations if the non-performance results from such unforeseeable circumstances as natural calamities, fire, changes of export/import regulations or law of any countries or territories with authority and jurisdiction, unavailability of supply or ingredients, failure of transport, the event of strike, lock-out, accident, fire, delay in manufacturing, delay of carriers, acts of God, government action, state of war, or any other causes beyond their control. The time stipulated for the fulfillment of the obligations shall be extended for a period equal to the duration of such circumstances. The Party for whom it has become impossible to meet its obligations under the Agreement shall immediately advise the circumstances preventing the fulfillment of its obligations and shall take all reasonable actions to cure the force majeure event(s).

(h) <u>Governing Law</u>. This Agreement shall be governed by the laws of the State of Arizona to the exclusion of all other conflict of law alternatives. The Parties consent to the exclusive jurisdiction and venue of the state and federal courts located in Maricopa County, Arizona.

(i) <u>Time</u>. Time is of the essence hereof.

(j) <u>Further Assurances</u>. The Parties each, at any time or from time to time, shall execute and deliver or cause to be delivered such further assurances, instruments or documents as may be reasonably necessary to fulfill the terms and conditions of this Agreement.

(k) <u>Interpretation</u>. Paragraph headings shall not be considered part of this Agreement and are included solely for convenience of reference and are not intended to be full or accurate descriptions of the contents of this Agreement. In this Agreement, words importing the singular number include the plural and vice versa and words importing the masculine gender include the feminine and neuter genders.

(l) <u>Counterparts</u>. This Agreement may be signed in counterparts and delivered by electronic means, each of which will be deemed to be an original and all of which shall constitute a single agreement effective as of the date first referenced above.

[SIGNATURE PAGE FOLLOWS]

15

**IN WITNESS WHEREOF** the Parties have duly executed this Agreement as of the day and year first above written.

IGNITE INTERNATIONAL, LTD.

By:_____    01/06/21_____

Name: John Schaefer
Title:    President

HIGHER CONNECTION

By:_ *Zach Gleason*  01/06/2021_____

Name:
Title:    Zach Gleason
President

## SCHEDULE A
## SERVICE LEVEL SPECIFICATIONS

Warehousing and Fulfillment Services

Such services include but are not limited to the following:

- Order fulfillment
- Shipping
- Kitting
- Pick and pack
- Warehousing and storage including receiving, put-away, inventory control
- Processing of Returns
- Print production
- Inventory control and maintenance including physical inventory counts
- Systems maintenance including shipping rates within Territories

| Service Level Specification |
| --- |
| Number of Orders Received |
| Number of Orders Filled |
| Number of Orders Shipped |
| Order Fill Rate: Number of Orders Received/Number of Orders Filled |
| Order Shipped Rate: Number of Orders Filled/Number of Orders Shipped |
| Orders Invoiced |
| Shipped to Invoiced Rate: Number of Orders Invoiced/Number of Orders Shipped |
| Number of Orders Returned |
| Returns to Invoiced: Number of Orders Returned/Number of Orders Invoiced |

## SCHEDULE B
# 3PL Proposal

| Higher Connection 3PL IGNITE | | | |
|---|---|---|---|
| **General Admin Fees** | **Fee Basis** | **Billing Frequency** | **Amount** |
| Account Set up: Online Inventory Account | Lump Sum | One time | $250.00 |
| Warehouse Storage | Per Pallet | Monthly | $1.5/sq ft |
| Online Inventory Access | Quickbooks | | Cost of software account |
| Online Reporting | Shopify /Quickbooks | | Cost of software account |
| **Receiving Fees** | | | |
| Receiving Fees | Per Pallet | Monthly | $12.00 |
| **Monthly Order Volume** | | | |
| Order Volume Matrix | 1-100 | 101-500 | 501-1000 | 1001+ |
| Fulfillment Fee | $3.00 | $2.95 | $2.85 | $2.75 |
| Per Item Fee | $0.13 | $0.13 | $0.13 | $0.13 |
| Label Fee | $0.05 | $0.05 | $0.05 | $0.05 |
| **LABOR** | | | |
| Administrative Labor | Per Hour | Per Request | $20.00 |
| Warehouse Labor | Per Hour | Per Request | $15.00 |
| Overtime Labor | Per Hour | Per Request | $30.00 |
| Bill of Ladings | Each | Per Shipment | $4.00 |
| Commercial Invoice | Each | Per Shipment | $2.00 |
| | | | |
| **Packaging** | | | |
| Boxes, Custom boxes, Stickers, Other materials | Each | Per Request | Invoice + 10% |
| **Return Management** | | | |
| Return Manifesting | Each | Per shipment | 3 |
| Handling/ Repackaging | Per Hour | Per shipment | 12 |

SCHEDULE B

# Key Takeaways

- Minimal storage fees
- Minimal fulfillment fees
- Minimal special request fees
- Shopify and quickbook reporting and live inventory access
- Seperate Storage and inventory reporting for Higher Connection 3pl and distribution on Ignite products
- Business to Business fulfillment only

## SCHEDULE C
## TRADE MARKS

**Part 1. Trade mark registrations**

| Registration number | Country | Mark | Registration date | Class |
|---|---|---|---|---|
| C20180206-0812 | State of Nevada, United States of America. | IGNITE CANNABIS CO. | 06 Feb 2018 | 107. |
| 1457985 | WIPO | | 26 November 2018. | 1, 3, 5, 25, 29, 30, 31, 32, 33, 34. |
| 1980738 | Mexico. | IGNITE | 20 March 2019. | 1. |
| 1980739 | Mexico. | IGNITE | 20 March 2019. | 5. |
| 1980740 | Mexico. | IGNITE | 20 March 2019. | 29. |
| 1972792 | Mexico. | IGNITE | 21 February 2019. | 31. |
| 1975360 | Mexico. | IGNITE | 27 February 2019. | 33. |
| 1986829 | Mexico. | IGNITE | 2 April 2019. | 35 |

**Part 2. Trade mark applications**

| Application number | Country | Mark | Application date | Class |
|---|---|---|---|---|
| 1882311 | Canada | IGNITE | 9 February 2018. | 5, 16, 18, 25, 29, 30, 31, 32, 33, 34, 35, 44. |
| 1924373 | Canada | IGNITE | 10 October 2018. | 1, 3, 9, 10, 18, 28, 41. |
| 017993120 | EU | IGNITE | 28 November 2018 | 1, 3, 5, 25, 29, 30, 31, 32, 33, 34. |
| 1457189 | WIPO | IGNITE | 4 December 2018 | 1, 3, 5, 25, 29, 30, 31, 32, 33, 34. |
| 2127325 | Mexico | IGNITE | 7 November 2018. | 44. |

| 2181445 | Mexico | IGNITE | 15 March 2019. | 34. |
|---|---|---|---|---|
| 2125498 | Mexico | IGNITE | 5 November 2018. | 1, 5, 29, 31, 33. |
| 88201639 | United States of America. | **IGNITE** | 20 November 2018. | 1, 3, 5, 25, 29, 30, 31, 32, 33, 34. |
| 88107250 | United States of America. | IGNITE | 6 September 2018. | 1, 3, 5, 9, 10, 18, 28, 29, 30, 31, 32, 33, 35, 41. |
| 87785026 | United States of America. | IGNITE | 5 February 2018. | 16. |
| 87785087 | United States of America. | IGNITE | 5 February 2018. | 34. |
| 87978922 | United States of America. | IGNITE | 5 February 2018. | 34. |

## Part 3. Copyright Registrations

| Registration number | Country | Mark | Registration date | Type |
|---|---|---|---|---|
| VA0002141 891 | United States of America. | IGNITE CANNABIS CO. | 11 March 2019. | Visual Arts. |

## Part 4. Unregistered marks

| Country | Mark | Date first used | Proposed Class |
|---|---|---|---|
| US | IGNITE YOUR LIFE | TBC | 1, 3, 5, 9, 10, 16, 18, 25, 28, 29, 30, 31, 32, 33, 34, 35, 36, 41, 44. |

**SCHEDULE D**
**TUPE ON EXIT**

**1.    PERSONNEL**

1.1    In this Schedule D the following definitions apply:

(a)    **New Supplier**: another party chosen by Ignite to take over the provision of all or part of the services provided by HC under this Agreement.

(b)    **Returning Employees**: those persons listed in a schedule to be agreed by the parties prior to the Subsequent Transfer Date who it is agreed were employed by HC wholly and/or mainly in the services provided by HC under this Agreement immediately before the Subsequent Transfer Date.

(c)    **Subsequent Transfer Date**: means the date or dates on which there is a transfer of responsibility for the provision of the services or part of the services provided by HC under this Agreement between HC and Ignite and/or a New Supplier (as the case may be).

(d)    **TUPE**: the Transfer of Undertakings (Protection of Employment) Regulations 2006 (*SI 2006/246*) (as amended).

1.2    The parties acknowledge and agree that where all or part of the services provided by HC under this Agreement cease to be provided by HC for any reason and where all or part of the services provided by HC under this Agreement continue to be provided by Ignite and/or a New Supplier, there may be a relevant transfer of the Returning Employees to Ignite and/or the New Supplier for the purposes of TUPE. If there is such a transfer, the employment of the Returning Employees shall transfer to Ignite and/or the New Supplier in accordance with TUPE with effect from the Subsequent Transfer Date.

1.3    Save where the parties reasonably believe that there will be no relevant transfer for the purposes of TUPE, the parties shall co-operate in agreeing a list of Returning Employees prior to the Subsequent Transfer Date, and shall co-operate in seeking to ensure the orderly transfer of the Returning Employees to Ignite and/or the New Supplier.

1.4    HC shall not later than six months prior to the expiry of this Agreement (or, if earlier, within 14 days of notice being given of termination of this Agreement) to the extent lawfully permitted provide Ignite with the following details:

(a)    a list of those personnel engaged in the services provided by HC under this Agreement **(Potential Returning Employees)**;

(b)    job title, age, length of continuous services, current remuneration, benefits, and notice periods of the Potential Returning Employees;

(c) terms and conditions of employment of the Potential Returning Employees, including any particulars that HC is obliged to give under section 1 of the Employment Rights Act 1996;

(d) any current disciplinary or grievance proceedings ongoing in respect of the Potential Returning Employees and any such proceedings in the preceding two years;

(e) any claims, current or which HC has reasonable grounds to believe will be brought by the Potential Returning Employees or their representatives or which have been brought in the preceding two years;

(f) all benefit schemes or arrangements (whether contractual or not) applicable in respect of the Potential Returning Employees;

(g) information on any collective agreements which will have effect in relation to the Potential Returning Employees after the Subsequent Transfer Date pursuant to TUPE.

HC shall provide updates of the details listed above at regular intervals to be specified by Ignite.

1.5 HC shall indemnify Ignite (both for itself and a New Supplier) against all costs, claims, liabilities and expenses (including legal expenses) incurred by Ignite and/or a New Supplier in connection with or as a result of:

(a) any claim or demand by any Returning Employee or a trade union or other body or person representing a Returning Employee (whether in contract, tort, under statute, pursuant to European law or otherwise) arising from any act, fault or omission of HC on or before the Subsequent Transfer Date;

(b) any failure by HC to comply with its obligations under regulations 13 and 14 of TUPE, or any award of compensation under regulation 15 of TUPE, save where such failure arises from the failure of Ignite and/or New Supplier to comply with its or their duties under regulation 13 of TUPE;

(c) a claim by any person who transfers or alleges that they have transferred to Ignite or the New Supplier but whose name is not included in the list of Returning Employees.

1.6 If TUPE applies to transfer the employment of any person employed by HC to Ignite or any New Supplier then if Ignite or such New Supplier shall serve a notice terminating the employment of such person within six months after the date of such transfer, HC shall indemnify Ignite (for itself and a New Supplier) in respect of any statutory or contractual redundancy payment payable in respect of such person, and any compensation or damages which Ignite is obliged to pay to such person for unfair and/or wrongful dismissal or as a reasonable settlement of a claim for such compensation or damages.

# EXHIBIT B

# Declaration of Zachariah James Gleason

DocuSign Envelope ID: D9C23372-CF07-4BD9-8AF8-D6C88D246CFD

**THE KOZUB LAW GROUP, PLC**
William A. Kozub, # 014826
Richard Hundley, # 019829
7537 East McDonald Drive
Scottsdale, Arizona 85250
mewak@kozublaw.com
Telephone: (480) 624-2700

Attorneys for Defendants Higher Connection, LLC; Higher Connection 3PL LLC; and Higher Connection LLC

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Ignite International, Ltd., a Wyoming corporation,<br><br>       Plaintiff,<br><br>vs.<br><br>Higher Connection LLC, a Utah limited liability company; Zachariah James Gleason; Mirza Baig; Higher Connection 3PL LLC, an Arizona limited liability company; and Higher Connection, LLC, an Arizona limited liability company;<br><br>       Defendants. | Case No. 2:2021-cv-02184<br><br>**DECLARATION OF ZACHARIA JAMES GLEASON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>(Assigned to United States Magistrate Judge Michael T. Morrissey) |
| Higher Connection LLC, a Utah limited liability company,<br><br>       Counterclaimant,<br><br>vs.<br><br>Ignite International, Ltd., a Wyoming corporation;<br><br>       Counterdefendant. | |

-1-

DocuSign Envelope ID: D9C23372-CF07-4BD9-8AF8-D6C88D246CFD

Defendant Zachariah James Gleason declares under penalty of perjury, as follows:

1. I am a resident of the State of Arizona.

2. I am a defendant in the lawsuit filed by Ignite International, Ltd. ("Plaintiff"), in the above captioned case.

3. I am a member Higher Connection LLC, a Utah limited liability company ("Higher Connection"). Mr. Mirza Baig is also a member of Higher Connection.

4. I am the Manager of Defendants Higher Connection 3PL, LLC, an Arizona limited liability company, Higher Connection, LLC, a Utah limited liability company, and Higher Connection, LLC, an Arizona limited liability company.

5. Defendants Higher Connection 3PL, LLC, an Arizona limited liability company, and Higher Connection, LLC, an Arizona limited liability company have never commenced business operations.

6. On or about December 14, 2020, Plaintiff and Higher Connection entered into a written agreement whereby Higher Connection would provide warehousing, pick & pack and shipping services to Plaintiff (hereinafter the "Fulfillment Agreement").

7. The two parties to the Fulfillment Agreement are Plaintiff and Higher Connection.

8. I am not a party to the Fulfillment Agreement.

9. I signed the Fulfillment Agreement in my capacity as the president and manager of Higher Connection. The Fulfillment Agreement was signed by Mr. John Schaefer as the president of Plaintiff.

10. Mr. Mirza Baig did not sign the Fulfillment Agreement and is not mentioned in the Fulfillment Agreement.

11. Attached hereto as Exhibit 1 is a copy of the Fulfillment Agreement dated December 14, 2020.

12. Upon formation of Higher Connection the members properly capitalized Higher Connection with sufficient funds to permit Higher Connection to operate, including paying start up expenses, hiring employees, purchasing office equipment and obtaining commercial space in

-2-

DocuSign Envelope ID: D9C23372-CF07-4BD9-8AF8-D6C88D246CFD

which to operate the business.

13. At all times since the formation of Higher Connection I have followed the formalities of the management structure of Higher Connection, and all business decisions of Higher Connection have been made pursuant to this management structure.

14. At all times since the formation of Higher Connection the company has maintained bank accounts for the operation of the business of Higher Connection.

15. Since the formation of Higher Connection the company has hired many employees and contractors. All employees and contractors have been paid by Higher Connection from Higher Connection bank accounts, with payroll tax withholdings being performed where required. All employees were properly paid by W-2 or 1099 requirements.

16. I have never commingled personal funds with the Higher Connection bank accounts. I have never commingled funds of any nature with the Higher Connection bank accounts.

17. I oversee the accounting of Higher Connection. The only funds received by the members or manager were paid pursuant to W-2 or 1099 requirements.

18. I did not owe a fiduciary duty to Plaintiff.

19. I have never been entrusted with any business secrets of the Plaintiff or powers of management over the Plaintiff.

20. The Fulfillment Agreement expressly disavows any "principal/agent" relationship and expressly provides that the relationship between Plaintiff and Higher Connection is purely a "contractual relationship."

21. I have never been provided any trade secrets of Plaintiff.

22. I have never used or misappropriated any trade secrets of Plaintiff.

23. There is no confusion in the public between the products manufactured by Plaintiff and the warehousing and shipping services of Higher Connection.

-3-

DocuSign Envelope ID: D9C23372-CF07-4BD9-8AF8-D6C88D246CFD

24.    Following the execution of the Fulfillment Agreement, Higher Connection ceased all manufacture of any products of a similar nature to those manufactured by the Plaintiff and Higher Connection resumed such business.

25.    I have never been enriched at the expense of Plaintiff and have never caused a impoverishment to the Plaintiff. All payments I have received from Higher Connection have been in my capacity as the manager and a member.

26.    There has been no impoverishment of the Plaintiff because the accounting records of Higher Connection do not match the accounting records of the Plaintiff, and the most recent accounting records of Higher Connection show the Plaintiff has been paid in full when all offsets and credits are properly applied.

27.    I have never personally sold any products of Plaintiff, and to my knowledge all of Plaintiff's products have been handled by Higher Connection pursuant to the normal business operations arising from the Fulfillment Agreement.

28.    I have no knowledge of specific contractual relationships or business expectancies of the Plaintiff other than the Fulfillment Agreement.

29.    I have never intentionally interfered in any contractual relationships or business expectancies of the Plaintiff.

30.    I have never exercised personal dominion or control over any property of the Plaintiff. My only interaction with the Plaintiff's property is as the manager of Higher Connection and pursuant to the Fulfilment Agreement.

31.    I have never taken any steps to conspire with another person to commit any tort against the Plaintiff. All of my actions in this matter have been pursuant to my role as a manager of Higher Connection, that was operating pursuant to the Fulfillment Agreement.

I declare the foregoing under penalty of perjury under the laws of the State of Arizona.

DATED this ____ day of May, 2023.

DocuSigned by:

*ZACHARIAH GLEASON*

30ABE1BC2FC0442

Zachariah James Gleason

-4-



1

## FULFILLMENT AGREEMENT

This  Agreement  is  made  and  entered  into  as  of  ████████ (the "**Effective Date**").
December 14, 2020

BETWEEN:

        **IGNITE INTERNATIONAL, LTD.**, a corporation incorporated under the laws of the State of Wyoming with its registered at 360 N. Sepulveda Blvd., Suite 2000, El Segundo, CA 90245

        ("**Ignite**")

AND

        **HIGHER CONNECTION, LLC**, a limited liability company formed under the laws of the State of Utah with its registered office at 1505 N. 29th Avenue, Phoenix, AZ 85009

        ("**HC**")

**WHEREAS:**

A.      HC is in the business of providing warehousing, pick & pack and shipping services for customers;

B.      Ignite wishes to engage HC to provide the Services (as defined herein) for Ignite's online orders for Products (as defined herein), on and subject to the terms and conditions in this Agreement (the "**Purpose**").

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party hereto, the Parties agree as follows:

1.      **DEFINITIONS**

In this Agreement:

(a)      "**Agreement**" means this agreement, including and Schedules.

(b)      "**business day**" means any day other than a Saturday, Sunday or a statutory holiday in the United States.

(c)      "**Change of Control**" means in respect of HC:  i) the closing of a merger, consolidation, liquidation or reorganization of HC into or with another company or other legal person, after which merger, consolidation, liquidation or reorganization the capital stock of HC outstanding prior to consummation of the transaction is not converted into or exchanged for or does not represent more than 50% of the aggregate voting power of the surviving or resulting entity; (ii) the direct or indirect acquisition by any person of more than 50% of the voting capital stock of HC, in a single or series of related transactions; (iii) the sale, exchange, or transfer of all or substantially all of HC's assets (other than a sale, exchange, or transfer to one or more entities where the stockholders of HC immediately before such sale, exchange or transfer retain, directly or indirectly, at least a majority of the beneficial interest in the voting stock of the entities to which the assets were transferred).(

2

(d)   **"Confidential Information"** means all information in any form (including electronic, physical, intangible, visual and oral, and whether or not marked, disclosed or indicated as confidential or proprietary) known, held, used or disclosed by or on behalf of a party and each of its affiliates and subsidiaries in connection with its or their business that is not at the time of disclosure available or known to the general public, or that, by its nature or the nature of its disclosure, ought reasonably be known as confidential, proprietary or a trade secret of Discloser or such affiliates or subsidiaries, including: technical information (including source code); Intellectual Property; supplier and customer information (whether past, present, future and prospective); strategic plans; data; technical information or engineering data (including drawings, writings, reports, analyses and notes) financial information; marketing information; business opportunity information, strategies, R&D; forecasts; and plans. Without limiting that, the Purpose and this Agreement are part of the Confidential Information.

(e)   **"Consents"** means all permissions, consents, approvals, certificates, permits, licenses, agreements and authorities (whether statutory, regulatory, contractual or otherwise) necessary for the provision of the Services on the terms of this Agreement.

(f)   **"Fulfillment Products"** means synthetic nicotine vape devices and related accessories.

(g)   **"Good Industry Practice"** means the exercise of that degree of skill, care, prudence, efficiency, foresight and timeliness as would be expected from a leading company within the relevant industry or business sector.

(h)   **"Ignite IPRs"** means Trade Marks and all Intellectual Property Rights of which Ignite is the owner or licensee and which are disclosed, licensed or provided to HC pursuant to this Agreement.

(i)   **"Ignite Materials"** means any equipment, tools, documents, information, items and materials, other than Fulfillment Products, whether owned by Ignite or a third party, provided by Ignite to HC which are used directly or indirectly in the supply of the Services.

(j)   **"Intellectual Property Rights or IPRs"** means patents, industrial designs, utility models, rights to inventions, copyright and neighboring and related rights, trademarks, trade names business names and domain names, rights in get-up and trade dress, goodwill and the right to sue for passing off, rights in designs, rights in computer software, rights in data, database rights, rights to use, and protect the confidentiality of, confidential information (including know-how and trade secrets), and all other intellectual property rights, in each case whether registered or unregistered and including all applications and rights to apply for and be granted, renewals or extensions of, and rights to claim priority from, any rights and all similar or equivalent rights or forms of protection that subsist or will subsist now or in the future in any part of the world.

(k)   **"Mandatory Policies"** means Ignite's business policies and codes notified by Ignite in writing to HC from time to time.

(l)   **"Party"** means a party to this Agreement and any reference to a Party includes its successors and permitted assigns and **"Parties"** means every Party.

(m)   **"Representative"** means an employee or authorized agent of HC or Ignite.

(n)   **"Service Level Specifications"** shall mean the Warehousing and Fulfillment Service Level Specifications attached hereto as Schedule A.

(o)   **"Services"** means HC's provision of certain warehousing, packaging, returns processing and

3

fulfillment services as described in the Service Level Specifications.

(p) **"Territory"** means the United States.

(q) **"Trade Marks"** means the trademark registrations and applications listed in Schedule C and any further trademarks that Ignite may, by express notice in writing, permit or procure permission for HC to use in the Territory in respect of the Fulfillment Products.

(r) **"Warehouses"** shall mean HC's warehouse buildings located at: 1505 N. 29th Avenue, Phoenix, Arizona 85009 and related facilities, including ingress thereto and egress therefrom, or any other warehouse facility of HC that is approved by Ignite, which approval shall not be unreasonably withheld or delayed.

## 2. FEES AND OTHER CHARGES

(a) Fees: The fees for the Services are set forth in Schedule B attached hereto (the **"Fees"**).

(b) Freight: All freight and postage expenses incurred on behalf of Ignite by HC in providing the Services shall be invoiced to Ignite at actual cost, not published rates, with no mark-up or additional fees; any such expenses incurred on behalf of Ignite by HC in providing the Services in connection with mixed shipments shall be allocated pro rata to the weight of the Fulfillment Products shipped. Such expenses shall be subject to the provisions of 2(d) of this Agreement. For purposes of this 2(b), "published rates" shall mean the then-prevailing, generally available common carrier charges that are issued by HC transportation suppliers. HC agrees to use commercially reasonable efforts to maximize efficiencies and reduce expenses for freight and postage incurred on behalf of Ignite in providing the Services.

(c) Taxes and Other Expenses: Ignite agrees that the Fees are exclusive of (i) freight, transportation and postal service charges and (ii) any manufacturer's, retailer's occupation, use, sales, excise, value added or other tax, or any similar charge imposed by any governmental authority with respect to the performance of the Services. Any such cost of freight, tax or charge, and all postal service charges, shall be paid by Ignite (in addition to the amount of any fees payable under this Agreement) against the provision by HC of a proper invoice and supporting documentation therefor.

(d) Discounts: Any signing bonus and volume or trade discounts and rebates earned or to be earned with respect to materials or services utilized by HC or for which HC contracts for or purchases on behalf of Ignite, in whole or in part, including freight, in connection with HC's performance under this Agreement shall be passed through to Ignite as either "on-invoice" credits or as credits issued by HC to Ignite within sixty (60) days after receipt of such bonus, discount, or rebate by HC.

(e) Adjustments: The Fees set forth in section 2(a) remain in effect for the Term subject to any further adjustments agreed in writing by both parties from time to time.

(f) Currency: Unless otherwise stated, all references to currency or $ in this Agreement are to the United States Dollar.

## 3. SERVICES

(a) Warehousing and Fulfillment Services: The Services covered by this Agreement are set forth in Schedule A along with the Service Level Specifications and are subject to revision from time to time by mutual written agreement of the parties.

4

(b)     Provision of Services: HC shall:

(i)     provide the Services on a non-exclusive basis in accordance with the specifications and within the time(s) set forth in the Service Level Specifications and/or as established by mutual agreement of the parties;

(ii)    provide the Services with reasonable skill and care and in accordance with Good Industry Practice;

(iii)   obtain, maintain and comply with all Consents;

(iv)    allocate sufficient resources to enable it to provide the Services in accordance with the terms of this Agreement;

(v)     ensure that all staff engaged in the provision of the Services will be competent and appropriately trained and under appropriate supervision;

(vi)    hold all Ignite Materials in safe custody at its own risk and maintain Ignite Materials in good condition until returned to Ignite, and not dispose of or use Ignite Materials other than in accordance with Ignite's written instructions or authorization;

(vii)   inform Ignite of all health and safety and security requirements that apply at the Warehouses; and

(viii)  notify Ignite in writing immediately upon the occurrence of a Change of Control of HC or any material change of HC's key management personnel.

(c)     Access to Logistics Software: Upon request of Ignite, HC shall grant Ignite access to view online inquiry screens of the warehouse and transportation management software or system(s) then currently being used for the operation of the Warehouses, for up to an agreed upon number of users.

4.   **OTHER PROVISIONS**

(a)     Inspection of Records: Ignite may inspect HC's records as they relate to the Services quarterly, at office working time and upon fifteen (15) days' prior notice to verify HC's compliance with its obligations under this Agreement. Ignite shall ensure that when carrying out any inspection it shall do so in such a way to avoid causing unnecessary disruption to the routine of HC. In fulfilling its obligations, HC may be required, from time to time upon request of Ignite, to produce a statement of account from supplier(s) which provide services to HC in the fulfillment of Services pertaining to this Agreement.

(b)     Comparable Pricing: HC represents that the Fees for the Services shall not be more than HC's lowest price to any other HC customers for comparable services, specifications and quantities.

(c)     HC shall:

(i)     store the Fulfillment Products in its possession separately from all other goods held by HC so that they remain readily identifiable as Ignite's property;

(ii)    not remove, deface or obscure any identifying mark or packaging on or relating to the Fulfillment Products; and

(iii)   keep and maintain the Fulfillment Products in good condition and/or in accordance with

5

Ignite's written instructions from time to time, shall not dispose of or use the Fulfillment Products other than in accordance with the Ignite's written instructions or authorization.

(d)    Subject to section 4(c):

   (i)    HC may use such method for the storage and handling of the Fulfillment Products as it in its absolute discretion considers appropriate; and

   (ii)   HC shall have a discretion as to where in the Warehouses it shall store the Fulfillment Products and it may, without notice to Ignite but at HC's expense, move the Fulfillment Products from one part of one of the Warehouses to another part of one of the Warehouses.

## 5.    PAYMENT TERMS

(a)    Services: HC shall invoice Ignite on a monthly basis for the Services pursuant to the methodology in Schedule B. Unless otherwise provided, invoices are payable by Ignite within thirty (30) days after receipt of the invoice.

(b)    Documentation: HC shall provide all and any appropriate back-up documentation to Ignite's finance department for all charges reflected on its monthly invoices.

(c)    Interest: If a party fails to make any payment due to the other under this Agreement by the due date for payment, then, without limiting the other party's remedies under this Agreement, the defaulting party shall pay interest on the overdue amount at the rate of 4% a year (to the maximum extent permitted by applicable law, whichever is less) until such balance has been paid in full. This interest shall accrue on a daily basis from the due date until actual payment of the overdue amount, whether before or after judgment. The defaulting party shall pay the interest together with the overdue amount. In relation to payments disputed in good faith, interest under this section 5(c) is payable only after the dispute is resolved, on sums found or agreed to be due, from the due date until payment.

## 6.    CONTACTS

HC and Ignite shall each designate a contact person to address any day-to-day issues that may arise under this Agreement with respect to the Services, including: establishing priorities; establishing, documenting and maintaining procedures; administering the financial arrangements under this Agreement; and other day-to-day matters. The respective contacts shall meet at least biweekly to review processes, procedures and Service Level Specifications so that they may be improved. To the extent the contact person is not authorized to decide any particular matter, the contact person will contact his or her organization to obtain a decision or call a meeting at which the decision will be made. The parties agree that as part of the biweekly meetings pursuant to this Section 6, they will discuss strategic decisions that may, directly or indirectly, affect the provision of the Services hereunder. Nothing in this Section 6, including any discussions, meetings or determinations of the parties at such meetings, shall operate to relieve either party from its obligations under this Agreement unless the parties mutually agree to do so in writing signed by both parties.

## 7.    HC'S FACILITY

(a)    HC shall maintain the Warehouses at its own expense and warrants on an ongoing basis that it has the right to use the Warehouses for the purpose of providing the Services. Except as specifically provided herein, the Services shall be provided exclusively at the Warehouses.

(b)    HC has provided to Ignite a disaster recovery plan that outlines procedures in the event of any disaster that could affect the performance of Services hereunder, including a failure in the computer

6

system or software for the Warehouses. HC shall maintain such disaster recovery plan in place, as it may be modified by HC from time to time in its reasonable discretion.

**8.    INTELLECTUAL PROPERTY RIGHTS**

(a)    HC acknowledges that Ignite's IPRs and the Trade Marks are and remain the exclusive property of Ignite or, where applicable, the third party licensor from whom Ignite derives the right to use them.

(b)    Ignite shall retain ownership of, and HC shall in no circumstances acquire any right, title or interest in or to, any Intellectual Property Rights in any Ignite Materials or Ignite IPRs.

(c)    HC shall have no right to use any of Ignite's IPRs and the Trade Marks on or in relation to any of its products or services unless express written consent is granted by Ignite. To the extent such rights are licensed by Ignite to HC, both parties agree that Ignite shall at all times retain direct or indirect control of the character and quality of the relevant goods and services of the relevant Trade Marks.

**9.    EMPLOYEES AND INDEPENDENT CONTRACTORS**

(a)    HC is an independent contractor and is not an agent or employee of Ignite. Nothing in this Agreement shall be construed to create an employer/employee, principal/agent, joint venture, partnership, or other relationship between HC and Ignite, other than the contractual relationship set forth herein. None of HC's employees shall be considered to be employees or agents of Ignite. HC shall be solely responsible for hiring, compensating, providing benefits to, and terminating all employees and independent contractors in connection with the operation of the Warehouse, in accordance with all applicable laws, statutes, rules, and regulations.

(b)    HC (and not Ignite) shall be responsible for the payment of all salary, benefits, income tax, employment insurance premiums, pension contributions, social security contributions and other deductions and withholdings, and for the operation of related payroll administration, with respect to HC's employees.

**10.    INSPECTION OF WAREHOUSE**

Ignite may have reasonable access during normal business hours to the Warehouses from time to time to observe HC's performance of the Services if and to the extent Ignite reasonably believes the Services are not being provided in accordance with the Service Level Specifications or to the extent necessary to permit Ignite to determine any matter relating to its rights and obligations hereunder, upon no less than seventy-two (72) hours' advance notice (or, in the case of urgent stock quality issues, upon no less than twenty-four (24) hours' advance notice); provided that any such access by Ignite shall not unreasonably interfere with the conduct of the business of HC. Ignite bears the risk of injury to any of its employees or representatives who are provided access to the Warehouses hereunder, and shall indemnify, defend and hold HC harmless for all damages resulting from Ignite's or its employees' or representatives' access to the Warehouses provided hereunder.

**11.    INSURANCE**

HC shall at all times during the Term maintain (i) property insurance from a carrier having an "A.M. Best" rating of not less than "A" sufficient to cover the replacement cost of capital equipment and personal property located at the Warehouses of $2,000,000; (ii) commercial general liability insurance from a carrier having an "A.M. Best" rating of not less than "A" with coverage of single

7

limit of not less than Five Million Dollars ($5,000,000), and (iii) worker's compensation insurance as required by law. HC shall ensure that Ignite and its affiliates are additional named insureds on each insurance policy. HC shall provide Ignite with a certificate of insurance evidencing that the insurance coverages required under this Section 11 are in full force and effect, as soon as available prior to commercial activation. HC shall provide updated certificates of insurance in the event of any renewal or replacement of such insurance coverages.

**12.    WARRANTIES, AGREEMENTS AND INDEMNITIES**

(a)    Service Levels; Service Level Specifications: HC agrees that all Services shall be performed in accordance and in compliance with the description of services set forth in this Agreement, including the Service Level Specifications set forth in Schedule A. For clarity, the failure to meet Service Level Specifications shall be considered a breach of this Agreement.

(b)    Compliance with Laws: Except with respect to materials supplied by Ignite, HC represents and warrants to Ignite that it is and will remain, in connection with the provision of the Services under this Agreement, in compliance with:

(i)    all applicable statutes, laws, rules and regulations, including applicable federal, provincial, state and local statutes, rules, regulations and orders relating to (1) the protection of the environment ("**Environmental Laws**"), (2) real estate, zoning, and construction, and (3) employment and employment practices, terms and conditions of employment, discrimination, harassment, child labor, safety, wages, hours and overtime rates, the withholding and payment of taxes from the compensation of employees, occupational health and safety laws and all other taxes and regulations pertaining to employment and employee benefits (collectively, "**Employment Laws**"); and

(ii)    the Mandatory Policies.

(c)    Indemnities:

(i)    HC agrees to defend, hold harmless and indemnify, on an after tax basis, Ignite and all shareholders, directors, officers, employees, representatives and agents thereof, from and against any and all claims, actions and allegations ("**Claims**") that may be made against such indemnified parties by third parties (including government agencies), and against liabilities, expenses (including reasonable attorneys' fees and costs) and damages (including for personal injury or death, or damage to property) for which Ignite becomes liable as the result of such Claims to the extent that such Claims arise directly from or in connection with HC's breach of any of its representations, warranties or agreements in this Agreement; provided, however, that if Ignite seeks indemnity hereunder it shall provide to HC prompt written notice of any such Claim, not make any admission in respect of such Claim and shall permit HC to defend the same in its own name or in the name of the party seeking indemnity hereunder; and provided further that Ignite may not settle any Claim without the prior written consent of HC.

(ii)    Ignite agrees to defend, hold harmless and indemnify, HC and all shareholders, directors, officers, employees, representatives and agents thereof, from and against any and all Claims that may be made against such indemnified parties by third parties (including government agencies), and against liabilities, expenses (including reasonable attorneys' fees and costs) and damages (including, without limitation, for personal injury or death, or damage to property) for which HC becomes liable as the result of such Claims, to the extent that such

8

Claims arise directly from or in connection with (A) Ignite's breach of any of its representations, warranties or agreements in this Agreement, or (B) content provided by Ignite to HC or any aspect of the Fulfillment Products (except to the extent Claims are related to how the Fulfillment Products were stored or processed through the Warehouse), including any claims of infringement, misappropriation or other violation of any intellectual property rights or personal rights related to such content or Fulfillment Products; provided, however, that if HC seeks indemnity hereunder it shall provide to Ignite prompt written notice of any such Claim, not make any admission in respect of such Claim and shall permit Ignite to defend the same in its own name or in the name of the party seeking indemnity hereunder; and provided further that HC may not settle any Claim without the prior written consent of Ignite.

(d)     Survival of Representations, Warranties and Agreements. The representations, warranties and agreements contained in this Agreement shall survive until the date of termination of this Agreement in accordance with its terms, other than those which by their nature are intended by the parties to survive termination.

(e)     Limitation of liability. Ignite's total cumulative liability arising in any manner under or in connection with this Agreement will not exceed the lesser of (i) the aggregate of the amounts paid by Ignite to HC under this Agreement in a 12-month period commencing with the date of this Agreement or any anniversary of it, and (ii) the maximum insurance coverage which may be claimed by Ignite as a result of such liability. Notwithstanding the foregoing, a party's liability under this Agreement for death or personal injury resulting from its gross negligence or any matter for which it would be illegal to exclude or attempt to exclude liability or any breach resulting from willful misconduct, shall not be limited.

(f)     Lien on Inventory.
  (i)     Ignite hereby agrees and acknowledges that, pursuant to Arizona law, HC has a warehouseman's lien against Ignite's goods now or hereafter in the possession of HC, and on the proceeds thereof, for charges and expenses in relation to such goods and for expenses necessary for preservation of such goods or reasonably incurred in their sale pursuant to law. Ignite hereby acknowledges that this Agreement and each invoice of HC issued hereunder constitute "warehouse receipts" under Arizona law.

  (ii)    In addition to and not in limitation of the foregoing Section 12(f)(i), Ignite hereby grants to HC a security interest and lien in all goods and inventory of Ignite, and the proceeds thereof, at any time in the possession of HC to secure any and all obligations or amounts owing at any time by Ignite to HC under this Agreement or under any other contract, or owing under statute or by operation of law.

  (iii)   If Ignite fails to pay all outstanding amounts due under this Agreement within thirty (30) days after termination of this Agreement and demand for final payment by HC, then HC, at its option, may (but shall not have any obligation to) (i) sell all or any of the Fulfillment Product in its inventory at public or private sale and (ii) exercise any and all other rights of a warehouse or secured party under and in accordance with the Arizona Uniform Commercial Code. Costs incurred by HC in the sale of Fulfillment Products under this Section are the responsibility of Ignite and shall be deducted from the proceeds of such sale. Sale of Fulfillment Product under this Section does not relieve Ignite of its obligation to pay the full amount of the outstanding balance of any amounts due HC under this Agreement or any other contract.

Case 2:21-cv-02184-MTL    Document 56-1    Filed 05/18/23    Page 43 of 56
Case 2:21-cv-02184-MTL   Document 1-2   Filed 12/21/21   Page 10 of 23

9

**13.    TITLE TO FULFILLMENT PRODUCTS AND RISK OF LOSS**

(a)    Title to the Fulfillment Products shall be held by Ignite at all times and HC shall acquire no rights in, to or over the Fulfillment Products at any time.

(b)    HC shall be responsible for unloading the Fulfillment Products at the Warehouses and the Fulfillment Products shall be at HC's risk during unloading.

(c)    The Fulfillment Products shall remain at HC's risk until their delivery into the possession of any of:

    (i)    Ignite or Ignite's carrier, agent or logistics provider; or

    (ii)    Ignite's customer or its customer's carrier, agent or logistics provider,

in each case as evidenced by written receipt.

(d)    HC shall be liable for (collectively, "**Loss**"):

    (i)    unaccountable losses of Fulfillment Products while in its custody or under its control beyond one-half of one percent (0.5%) of the value of the Fulfillment Products, calculated on an annual basis, based upon Ignite's actual cost of such Fulfillment Products (the "Shrinkage Allowance"); and

    (ii)    losses caused by out of rotation stock management and inefficient picking of the Fulfillment Products beyond the Shrinkage Allowance; and

    (iii)    ascertainable losses, destruction of or damage to the Fulfillment Products beyond the Shrinkage Allowance due to HC's negligence or willful acts, omissions and default, including but not limited to theft, misappropriation or damage caused by HC, its employees, agents or representatives while the Fulfillment Products are in the custody or under the control of HC.

(e)    HC shall compensate Ignite for any Loss at the full price of such Fulfillment Products and for any costs and expenses (including any sums payable by Ignite to its end-customers for non-delivery of the Fulfillment Products as a result of any Loss) incurred by Ignite as a result of the Loss.

**14.    CLAIMS**

All claims for damaged Fulfillment Products or for shortages must be made by Ignite in writing within thirty (30) calendar days after the relevant delivery, in each case fully setting forth the nature of the alleged damage or shortage and providing supporting evidence, including in the case of damaged Fulfillment Products samples demonstrating any such damage or reports from Ignite's customers.

**15.    TERM AND TERMINATION**

(a)    <u>Term.</u> This Agreement shall commence on the Effective Date and shall continue for a period of one (1) year (the "**Term**"), unless terminated earlier pursuant to the terms of this Agreement. The Term may be extended for additional one (1)-year periods upon the mutual agreement of the parties.

(b)    <u>Termination for Convenience</u>. Either Party shall have the right to terminate this Agreement for any reason upon delivery of sixty (60) days' written notice to the other Party.

10

(c)    Termination With Cause. In the event of a material breach of this Agreement by either Party, the non-breaching Party, in addition to any other remedy that it may have, shall have the right to terminate this Agreement by written notice to the breaching Party setting forth the details and date of the purported breach. If the breach is not cured within thirty (30) days after such notice, the non-breaching Party alleging the breach shall have the right to terminate this Agreement by further notice to the breaching Party and this Agreement shall terminate as of the date of such further notice. Subject to the terms hereof all rights, remedies and recourses provided for herein shall be in addition and without prejudice to the rights and remedies available to the Parties.

(d)    Termination on Insolvency. Either Party may terminate this Agreement should the other Party make an assignment for the benefit of its creditors, file a petition in bankruptcy, be adjudicated insolvent or bankrupt, file a petition or apply to any tribunal for any receiver, trustee, liquidator or sequestrator of any substantial portion of its property, or should the other Party commence any proceeding under any law or statute of any jurisdiction respecting insolvency, bankruptcy, reorganization, arrangement, re-adjustment of debt, dissolution, winding-up, composition or liquidation, or otherwise take advantage of any bankruptcy or insolvency legislation.

(e)    Termination on Change of Control. Ignite may terminate this Agreement by written notice without payment of any amount or penalty if there is a Change of Control of HC to which Ignite reasonably objects, provided that Ignite serves its notice within three months of the date on which HC informs Ignite (by written notice) of the Change of Control or on which Ignite otherwise becomes aware of the Change of Control.

(f)    Effect of Termination. The parties agree that, should termination of this Agreement occur for any reason, HC shall

   (i)    cease all manufacturing and distribution of the Products as soon as practical and, so long as this Agreement is not terminated by Ignite due to a material breach by HC, HC shall have the right, for a six-month period, to market and dispose of all remaining inventory of the Products in the ordinary course of business, in accordance with the terms and conditions of this Agreement; and

   (ii)    Except with respect to Sections 2, 12, and 16-19 and other obligations that expressly survive the expiration or termination of this Agreement, all other rights and licenses granted under this Agreement shall terminate on the termination date.

(a)    If HC fails to perform any of its material obligations under this Agreement, and fails to cure the same within thirty (30) days after receipt of written notice from Ignite specifying such default, Ignite shall have the right to terminate its obligations under this Agreement (except such obligations as relate to the performance of Services prior to termination). This right of Ignite shall be in addition to and not in substitution for any other rights of Ignite.

(b)    If Ignite fails to perform any of its material obligations under this Agreement (including paying any invoice when due, except in the case of a good faith dispute with respect to such invoice, in which case Ignite shall be obligated to pay the amount of such invoice that is not in dispute) and fails to cure the same within thirty 30 days after receipt of written notice from HC specifying such default, then HC shall have the right to terminate its obligations under this Agreement (except such obligations as relate to the performance of Services prior to termination). This right of HC shall be in addition to and not in substitution for any other rights of HC.

11

**16.    CONFIDENTIALITY**

(a)    <u>Disclosure and Term</u>. Both Ignite and HC acknowledge that each party (in such context a "**Discloser**") may disclose to the other ("**Recipient**") Confidential Information. This Section 16 covers disclosure of Confidential Information during the five (5) year period following the date set out below, but Recipient's obligations in respect of the Confidential Information will survive in perpetuity, subject to (c).

(b)    <u>Obligations</u>. Recipient will, at all times, protect, keep confidential and safeguard all of Discloser's Confidential Information using the same degree of care as Recipient uses to protect Recipient's own similar information, but at least a reasonable degree of care, including: (a) promptly notifying Discloser of any breach of this Section and reasonably assisting Discloser in connection therewith; (b) not, directly or indirectly, using or copying any of Discloser's Confidential Information except as strictly necessary to carry out the terms of this Agreement; and (c) disclosing Discloser's Confidential Information strictly to representatives (and, if applicable, employees and other personnel) of Recipient or Recipient's organization for whom disclosure is necessary to carry out the Purpose on a strictly "need to know" basis (each "**Further Recipients**"), provided that such Further Recipient has a legally-enforceable obligation of confidentiality at least as restrictive as that set out in this Agreement. Recipient will ensure that its Further Recipient's fully comply with this Agreement and will be responsible for all acts and omissions thereof as if Recipient's own.

(c)    <u>Required Disclosure and other Exceptions</u>. If Recipient is requested or required under any law (including questions, interrogatories, requests, subpoenas, civil demands or similar processes, and including regulatory bodies) to disclose any Discloser Confidential Information, Recipient may disclose strictly that which is required, provided that Recipient gives Discloser prompt written notice of such requirement so that Discloser may contest or restrict the disclosure, and reasonably cooperates in good faith with Discloser in Discloser's efforts to so restrict or contest such disclosure. Furthermore, Recipient has no obligations to information where it can establish, with documentary evidence and other than in connection with a breach of this Agreement, such information (a) was already, or becomes, known to Recipient without a duty of confidentiality and without direct or indirect use whatsoever of Discloser's Confidential Information, or (b) is, or becomes, generally available to the public rightfully without restrictions of confidentiality.

(d)    <u>Return</u>. Upon request of Discloser, Recipient will immediately return to Discloser all of Discloser's Confidential Information in any form (including copies and extracts) in its possession or control that are capable of return, and will destroy all others, and will thereafter promptly provide a certificate (of an authorized officer, if appropriate) confirming compliance herewith. Recipient may destroy electronic Confidential Information using commercially reasonable means (but any such Confidential Information restored or recovered by any means will be treated confidentially pursuant to this Agreement).

(e)    <u>Ownership</u>. Recipient acknowledges and agrees that all Discloser Confidential Information is the sole and exclusive property of Discloser regardless of when it came into being, and that all right, title and interest therein and thereto will be and remain vested in Discloser or its licensors except for the limited right for to use it in accordance with this Agreement for the Purpose.

(f)    <u>Disclaimer</u>. All Confidential Information is provided "as-is" and "as-available", and Discloser expressly disclaims any warranties, express, implied or otherwise, regarding its Confidential Information. Discloser shall have no liability of any nature or kind whatsoever (including consequential loss or damage) to Recipient resulting from disclosure of Confidential Information hereunder.

12

(g)  Notices. Every notice to be given pursuant to this Section 16 will be in writing and delivered personally or sent by registered or certified mail to the address set out above (or by such means as the receiving party may give notice).

(h)  Relief. Recipient acknowledges that a breach of this Section 16 would cause Discloser immediate, irreparable harm for which money would be inadequate recompense. Upon any actual or threatened breach hereof, Discloser may, without limiting other remedies, seek to enforce this Section by injunction, specific performance or other equitable relief, without proof of actual damage or posting of any security bond.

## 17. TRANSITION PROVISIONS ON TERMINATION

The following provisions are intended to survive the date on which this Agreement is terminated ("**End Date**"):

(a)  Returns: HC shall continue to process all returns received for the ninety (90) day period following the End Date.

(b)  Inventory Removal: Following the End Date, at Ignite's expense Ignite shall remove the Fulfillment Products from the Warehouses (but in any event no later than thirty (30) days prior to the End Date), and HC shall, at Ignite's request, provide reasonable assistance (at Ignite's expense) to Ignite in connection therewith. Notwithstanding the foregoing, HC agrees that Ignite may begin to so remove Fulfillment Products from the Warehouses starting ninety (90) days before the End Date. During this time, Ignite will be billed at the normal rates; provided that any charges incurred by HC in connection with the removal shall be charged to Ignite at actual cost (and not the Fees set forth in Schedule B). Ignite shall ensure that the remaining Fulfillment Products at the Warehouses are at all times sufficient for the provision of Services in accordance with this Agreement to be continued until the End Date.

(c)  Referrals: Until ninety (90) days after the End Date, HC shall duly and promptly refer to Ignite all customer calls, faxes, emails, orders, complaints, and written correspondence (to the extent HC actually receives any such customer calls, faxes, emails, orders, complaints, or written correspondence).

(d)  Effect on Rights: Neither the expiration nor termination of this Agreement for any reason shall affect any rights or obligations of any party which have accrued as of the effective date of such expiration or termination. Upon any termination or expiration of this Agreement, neither party shall have any liability nor obligation to the other hereunder except as expressly provided in this Agreement.

## 18. NOTICES

(a)  Method of Delivery. All notices to be sent to a Party shall either be sent or dispatched via e-mail with confirmed answer-back by e-mail or proof of delivery or mailed by First Class prepaid Air Mail or registered mail return receipt requested, to the Parties as shown below.

  If to HC:

  Higher Connection
  1505 N. 29th Avenue
  Phoenix, AZ 85009

13

Attn: Zach Gleason
Email: zach.gleason@higherconnection.co

With a copy to:
William A. Kozub, Esq.
The Kozub Law Group, PLC
7537 E. McDonald Drive
Scottsdale, Arizona 85254
Email: wkozub@kozublaw.com

If to Ignite:
Ignite International, Ltd.
360 N. Sepulveda Blvd.
Suite 2000
El Segundo, CA 90245
Attn:   John Schaefer, President
Email: johnschaefer@ignite.co

With a copy to:

paul.dawdall@ignite.co
linda.menzel@ignite.co

(b)    Deemed Receipt. A notice delivered in accordance with the foregoing shall be deemed to have been received on the date of delivery or, if sent by e-mail, on the day of transmission or, if such day is not a business day, on the first business day following the day of transmission; provided that if such notice is delivered or sent by email after 4:30 p.m. (local time), such notice will be deemed to be received on the next business day. The Parties may from time to time notify the other in the manner provided in section 19(a) of a change of address which from the effective date of such notice and until changed by like notice, shall be the address of such Company, for all purposes of this Agreement.

### 19.    MISCELLANEOUS

(a)    Amendments and Updates. This Agreement may not be modified or amended unless in writing by mutual agreement of the Parties. Provided however, the Parties acknowledge and agree that the Fulfillment Products and Specifications may be subject to further change in accordance with the provisions of this Agreement or as otherwise agreed by the Parties. Any and all such amendments and updates shall be in written form, shall be agreed to by the Parties in writing and shall be deemed incorporated in this Agreement.

(b)    Successors and Assigns. This Agreement and each and every covenant, term and condition herein shall be binding upon and inure to the benefit of both the Parties hereto and their respective successors. HC may not assign, sell, or otherwise transfer any or all rights and obligations under this Agreement without the prior written consent of Ignite. Ignite shall be entitled to assign, sell, or otherwise transfer all of its rights and obligations under this Agreement.

(c)    Entire Agreement. This Agreement, including the Schedules hereto and any Supplemental Notices which are incorporated into and form an integral part of this Agreement, is a complete and exclusive

statement of the Agreement between the Parties and supersedes all prior and contemporaneous agreements, negotiations, discussions, and proposals, oral or written, and any and all other communication relating to the subject matter of this Agreement.

14

(d)     Severability. Should any part or provision of this Agreement be held unenforceable or in conflict with the applicable laws or regulations of any jurisdiction, the invalid or unenforceable part or provision shall be replaced with a provision which accomplishes, to the extent possible, the original business purpose of such part or provision in a valid and enforceable manner, and the remainder of this Agreement shall remain binding upon the Parties hereto. In the event that such a provision cannot be included in the Agreement and the absence thereof materially changes a Party's obligations or rights under this Agreement, such Party shall have the right to terminate this Agreement.

(e)     Partnership or Agency. Nothing in this Agreement shall be deemed to constitute or imply a partnership between the Parties. HC shall not have the authority to bind Ignite or to contract in the name of Ignite or create any liability for Ignite at any time. Ignite shall not have the authority to bind HC or to contract in the name of HC or create any liability for HC at any time.

(f)     Waiver: The failure of either Party to enforce any term or condition of this Agreement shall not be construed to be a waiver of such term or the Party's responsibility for such term or condition, and shall in no way affect the right of a Party to enforce thereafter said term or condition.

(g)     Force Majeure. Neither Party shall bear responsibility for the complete or partial non-performance of any of its obligations if the non-performance results from such unforeseeable circumstances as natural calamities, fire, changes of export/import regulations or law of any countries or territories with authority and jurisdiction, unavailability of supply or ingredients, failure of transport, the event of strike, lock-out, accident, fire, delay in manufacturing, delay of carriers, acts of God, government action, state of war, or any other causes beyond their control. The time stipulated for the fulfillment of the obligations shall be extended for a period equal to the duration of such circumstances. The Party for whom it has become impossible to meet its obligations under the Agreement shall immediately advise the circumstances preventing the fulfillment of its obligations and shall take all reasonable actions to cure the force majeure event(s).

(h)     Governing Law. This Agreement shall be governed by the laws of the State of Arizona to the exclusion of all other conflict of law alternatives. The Parties consent to the exclusive jurisdiction and venue of the state and federal courts located in Maricopa County, Arizona.

(i)     Time. Time is of the essence hereof.

(j)     Further Assurances. The Parties each, at any time or from time to time, shall execute and deliver or cause to be delivered such further assurances, instruments or documents as may be reasonably necessary to fulfill the terms and conditions of this Agreement.

(k)     Interpretation. Paragraph headings shall not be considered part of this Agreement and are included solely for convenience of reference and are not intended to be full or accurate descriptions of the contents of this Agreement. In this Agreement, words importing the singular number include the plural and vice versa and words importing the masculine gender include the feminine and neuter genders.

(l)     Counterparts. This Agreement may be signed in counterparts and delivered by electronic means, each of which will be deemed to be an original and all of which shall constitute a single agreement effective as of the date first referenced above.

[SIGNATURE PAGE FOLLOWS]

15

IN WITNESS WHEREOF the Parties have duly executed this Agreement as of the day and year first above written.

IGNITE INTERNATIONAL, LTD.

By: _____   01/06/21

Name: John Schaefer

Title:    President


HIGHER CONNECTION

By: _Zach Gleason_ 01/06/2021_____

Name:
Title:   Zach Gleason
         President

**SCHEDULE A**
**SERVICE LEVEL SPECIFICATIONS**

<u>Warehousing and Fulfillment Services</u>

Such services include but are not limited to the following:

- Order fulfillment
- Shipping
- Kitting
- Pick and pack
- Warehousing and storage including receiving, put-away, inventory control
- Processing of Returns
- Print production
- Inventory control and maintenance including physical inventory counts
- Systems maintenance including shipping rates within Territories

| Service Level Specification |
| --- |
| Number of Orders Received |
| Number of Orders Filled |
| Number of Orders Shipped |
| Order Fill Rate: Number of Orders Received/Number of Orders Filled |
| Order Shipped Rate: Number of Orders Filled/Number of Orders Shipped |
| Orders Invoiced |
| Shipped to Invoiced Rate: Number of Orders Invoiced/Number of Orders Shipped |
| Number of Orders Returned |
| Returns to Invoiced: Number of Orders Returned/Number of Orders Invoiced |

SCHEDULE B
# 3PL Proposal

| Higher Connection 3PL IGNITE | | | | |
|---|---|---|---|---|
| **General Admin Fees** | **Fee Basis** | **Billing Frequency** | **Amount** | |
| Account Set up: Online Inventory Account | Lump Sum | One time | $250.00 | |
| Warehouse Storage | Per Pallet | Monthly | $1.5/sq ft | |
| Online Inventory Access | Quickbooks | | Cost of software account | |
| Online Reporting | Shopify /Quickbooks | | Cost of software account | |
| **Receiving Fees** | | | | |
| Receiving Fees | Per Pallet | Monthly | $12.00 | |
| **Monthly Order Volume** | | | | |
| Order Volume Matrix | 1-100 | 101-500 | 501-1000 | 1001+ |
| Fulfillment Fee | $3.00 | $2.95 | $2.85 | $2.75 |
| Per Item Fee | $0.13 | $0.13 | $0.13 | $0.13 |
| Label Fee | $0.05 | $0.05 | $0.05 | $0.05 |
| **LABOR** | | | | |
| Administrative Labor | Per Hour | Per Request | $20.00 | |
| Warehouse Labor | Per Hour | Per Request | $15.00 | |
| Overtime Labor | Per Hour | Per Request | $30.00 | |
| Bill of Ladings | Each | Per Shipment | $4.00 | |
| Commercial Invoice | Each | Per Shipment | $2.00 | |
| | | | | |
| **Packaging** | | | | |
| Boxes, Custom boxes, Stickers, Other materials | Each | Per Request | Invoice + 10% | |
| **Return Management** | | | | |
| Return Manifesting | Each | Per shipment | 3 | |
| Handling/ Repackaging | Per Hour | Per shipment | 12 | |

**SCHEDULE B**

# Key Takeaways

- Minimal storage fees
- Minimal fulfillment fees
- Minimal special request fees
- Shopify and quickbook reporting and live inventory access
- Seperate Storage and inventory reporting for Higher Connection 3pl and distribution on Ignite products
- Business to Business fulfillment only

**SCHEDULE C**
**TRADE MARKS**

**Part 1. Trade mark registrations**

| Registration number | Country | Mark | Registration date | Class |
|---|---|---|---|---|
| C20180206-0812 | State of Nevada, United States of America. | | 06 Feb 2018 | 107. |
| 1457985 | WIPO | | 26 November 2018. | 1, 3, 5, 25, 29, 30, 31, 32, 33, 34. |
| 1980738 | Mexico. | IGNITE | 20 March 2019. | 1. |
| 1980739 | Mexico. | IGNITE | 20 March 2019. | 5. |
| 1980740 | Mexico. | IGNITE | 20 March 2019. | 29. |
| 1972792 | Mexico. | IGNITE | 21 February 2019. | 31. |
| 1975360 | Mexico. | IGNITE | 27 February 2019. | 33. |
| 1986829 | Mexico. | IGNITE | 2 April 2019. | 35 |

**Part 2. Trade mark applications**

| Application number | Country | Mark | Application date | Class |
|---|---|---|---|---|
| 1882311 | Canada | IGNITE | 9 February 2018. | 5, 16, 18, 25, 29, 30, 31, 32, 33, 34, 35, 44. |
| 1924373 | Canada | IGNITE | 10 October 2018. | 1, 3, 9, 10, 18, 28, 41. |
| 017993120 | EU | IGNITE | 28 November 2018 | 1, 3, 5, 25, 29, 30, 31, 32, 33, 34. |
| 1457189 | WIPO | | 4 December 2018 | 1, 3, 5, 25, 29, 30, 31, 32, 33, 34. |
| 2127325 | Mexico | IGNITE | 7 November 2018. | 44. |

| 2181445 | Mexico | IGNITE | 15 March 2019. | 34. |
| 2125498 | Mexico | IGNITE | 5 November 2018. | 1, 5, 29, 31, 33. |
| 88201639 | United States of America. | IGNITE | 20 November 2018. | 1, 3, 5, 25, 29, 30, 31, 32, 33, 34. |
| 88107250 | United States of America. | IGNITE | 6 September 2018. | 1, 3, 5, 9, 10, 18, 28, 29, 30, 31, 32, 33, 35, 41. |
| 87785026 | United States of America. | IGNITE | 5 February 2018. | 16. |
| 87785087 | United States of America. | IGNITE | 5 February 2018. | 34. |
| 87978922 | United States of America. | IGNITE | 5 February 2018. | 34. |

## Part 3. Copyright Registrations

| Registration number | Country | Mark | Registration date | Type |
|---|---|---|---|---|
| VA0002141 891 | United States of America. | IGNITE CANNABIS CO. | 11 March 2019. | Visual Arts. |

## Part 4. Unregistered marks

| Country | Mark | Date first used | Proposed Class |
|---|---|---|---|
| US | IGNITE YOUR LIFE | TBC | 1, 3, 5, 9, 10, 16, 18, 25, 28, 29, 30, 31, 32, 33, 34, 35, 36, 41, 44. |

**SCHEDULE D**
**TUPE ON EXIT**

1. **PERSONNEL**

1.1    In this Schedule D the following definitions apply:

   (a)    **New Supplier**: another party chosen by Ignite to take over the provision of all or part of the services provided by HC under this Agreement.

   (b)    **Returning Employees**: those persons listed in a schedule to be agreed by the parties prior to the Subsequent Transfer Date who it is agreed were employed by HC wholly and/or mainly in the services provided by HC under this Agreement immediately before the Subsequent Transfer Date.

   (c)    **Subsequent Transfer Date**: means the date or dates on which there is a transfer of responsibility for the provision of the services or part of the services provided by HC under this Agreement between HC and Ignite and/or a New Supplier (as the case may be).

   (d)    **TUPE**: the Transfer of Undertakings (Protection of Employment) Regulations 2006 (*SI 2006/246*) (as amended).

1.2    The parties acknowledge and agree that where all or part of the services provided by HC under this Agreement cease to be provided by HC for any reason and where all or part of the services provided by HC under this Agreement continue to be provided by Ignite and/or a New Supplier, there may be a relevant transfer of the Returning Employees to Ignite and/or the New Supplier for the purposes of TUPE. If there is such a transfer, the employment of the Returning Employees shall transfer to Ignite and/or the New Supplier in accordance with TUPE with effect from the Subsequent Transfer Date.

1.3    Save where the parties reasonably believe that there will be no relevant transfer for the purposes of TUPE, the parties shall co-operate in agreeing a list of Returning Employees prior to the Subsequent Transfer Date, and shall co-operate in seeking to ensure the orderly transfer of the Returning Employees to Ignite and/or the New Supplier.

1.4    HC shall not later than six months prior to the expiry of this Agreement (or, if earlier, within 14 days of notice being given of termination of this Agreement) to the extent lawfully permitted provide Ignite with the following details:

   (a)    a list of those personnel engaged in the services provided by HC under this Agreement (**Potential Returning Employees**);

   (b)    job title, age, length of continuous services, current remuneration, benefits, and notice periods of the Potential Returning Employees;

(c)     terms and conditions of employment of the Potential Returning Employees, including any particulars that HC is obliged to give under section 1 of the Employment Rights Act 1996;

(d)     any current disciplinary or grievance proceedings ongoing in respect of the Potential Returning Employees and any such proceedings in the preceding two years;

(e)     any claims, current or which HC has reasonable grounds to believe will be brought by the Potential Returning Employees or their representatives or which have been brought in the preceding two years;

(f)     all benefit schemes or arrangements (whether contractual or not) applicable in respect of the Potential Returning Employees;

(g)     information on any collective agreements which will have effect in relation to the Potential Returning Employees after the Subsequent Transfer Date pursuant to TUPE.

HC shall provide updates of the details listed above at regular intervals to be specified by Ignite.

1.5     HC shall indemnify Ignite (both for itself and a New Supplier) against all costs, claims, liabilities and expenses (including legal expenses) incurred by Ignite and/or a New Supplier in connection with or as a result of:

(a)     any claim or demand by any Returning Employee or a trade union or other body or person representing a Returning Employee (whether in contract, tort, under statute, pursuant to European law or otherwise) arising from any act, fault or omission of HC on or before the Subsequent Transfer Date;

(b)     any failure by HC to comply with its obligations under regulations 13 and 14 of TUPE, or any award of compensation under regulation 15 of TUPE, save where such failure arises from the failure of Ignite and/or New Supplier to comply with its or their duties under regulation 13 of TUPE;

(c)     a claim by any person who transfers or alleges that they have transferred to Ignite or the New Supplier but whose name is not included in the list of Returning Employees.

1.6     If TUPE applies to transfer the employment of any person employed by HC to Ignite or any New Supplier then if Ignite or such New Supplier shall serve a notice terminating the employment of such person within six months after the date of such transfer, HC shall indemnify Ignite (for itself and a New Supplier) in respect of any statutory or contractual redundancy payment payable in respect of such person, and any compensation or damages which Ignite is obliged to pay to such person for unfair and/or wrongful dismissal or as a reasonable settlement of a claim for such compensation or damages.